**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLORADO**

Civil Action No.

THOMAS VILLANUEVA

      Plaintiff,

v.

EL PASO COUNTY;
BILL ELDER, Sheriff, El Paso County Sheriff's Office, in his official capacity;
The Estate of MICAH FLICK, Deputy, El Paso County Sheriff's Office, in his individual capacity;
SCOTT STONE, Deputy, El Paso County Sheriff's Office, in his individual capacity;
JACOB ABENDSCHAN, Sergeant, El Paso County Sheriff's Office, in his official and individual capacities;
JOHN WATTS, Detective, El Paso County Sheriff's Office, in his individual capacity;
TREMAINE WHITE, Detective, El Paso County Sheriff's Office, in his individual capacity;
STEPHANIE CRISS, Detective, El Paso County Sheriff's Office, in her individual capacity;
MICHAEL BOGGS, Detective, El Paso County Sheriff's Office, in his individual capacity;
THE CITY OF COLORADO SPRINGS, COLORADO,
PETER CAREY, Chief of Police, Colorado Springs Police Department, in his official capacity;
KEVIN MIYAKUSU, Sergeant, Colorado Springs Police Department, in his official and individual capacities;
MARCUS YANEZ, Officer, Colorado Springs Police Department, in his individual capacity;
JOHN REINDOLLAR, Investigator, Colorado State Patrol, in his individual capacity; and
CHAD HUNT, Sergeant, Colorado State Patrol, in his individual capacity,

      Defendants.

---

**PLAINTIFF'S COMPLAINT AND JURY DEMAND**

---

1

COMES NOW, the Plaintiff, Thomas Villanueva, by and through his attorneys, Ramos Law, and hereby submits his Civil Complaint and Jury Demand against the Defendants, El Paso County, the City of Colorado Springs, Bill Elder, the Estate of Micah Flick, Scott Stone, Peter Carey, Kevin Miyakusu, Marcus Yanez, Jacob Abendschan, John Watts, Tremaine White, Stephanie Criss, Michael Boggs, John Reindollar, and Chad Hunt, and sets forth herein:

**STATEMENT OF FACTS**

On February 5, 2018, the Beat Auto Theft Through Law Enforcement (BATTLE) team, composed of officers from the El Paso County Sheriff's Office, Colorado Springs Police Department, and Colorado State Patrol, were attempting to track down stolen cars. In mid-morning the team spotted a stolen 1999 Saturn. After placing a GPS tracker on the vehicle, the officers began conducting surveillance of the vehicle and suspect, Manuel Zetina (hereinafter, "Mr. Zetina"). The Defendants followed Mr. Zetina to multiple apartment complexes, including the Marquis Heights Apartments, Shannon Glen Apartments, and Murray Hill Apartment complex. At each location, the Defendants set up a "takeaway," which is an operational perimeter[1] in all directions. At each takeaway, the Defendants would position themselves so that one vehicle of officers could inconspicuously follow the suspect in any direction.

While conducting surveillance, the officers learned that Mr. Zetina was a gang member. Specifically, Mr. Zetina was a Hispanic man wearing a shirt with the number "13" on it. The officers knew that the number 13 is associated with the thirteenth letter of the alphabet, "M," which is a homage to the Mexican Mafia. Additionally, the officers observed Mr. Zetina conducting multiple moves designed to evade law enforcement while driving around the City of Colorado Springs.

---

[1] "Perimeter" is law enforcement terminology for the area where officers are conducting an operation.

2

At approximately 3:30 p.m. the Murray Hill Apartment complex[2] the officers decided to attempt a "takedown"[3] of Mr. Zetina because Mr. Zetina had exited his vehicle at that location. After conducting surveillance at Murray Hill Apartments, Deputy White advised Sergeant Miyakusu that Mr. Zetina could be apprehended. Sergeant Miyakusu gave the go-ahead to conduct the takedown. At the same time, Deputy White communicated to the team that Mr. Zetina's left arm was flexed and inside his hoodie, which was a clear sign that Mr. Zetina was armed with a weapon and a potential threat. However, the operation continued.

At the same exact time, Mr. Villanueva was seen walking in and through the complex's parking lot by Officers White, Abendschan, Watts, Boggs, Yanez, and Criss.  Mr. Villanueva lived in the apartment complex and was walking home after buying a sandwich.  These officers affirmatively allowed Mr. Villanueva to continue walking towards Mr. Zetina within the operational perimeter, even though they knew that Mr. Zetina was armed with a weapon and that they were in plain clothes and in unmarked cars.

At the apartment complex, Deputies Flick and Stone approached Mr. Zetina and attempted to grab him with a "bear hug." [4] The officers did so even though they knew that Mr. Zetina was armed, and while Mr. Villanueva was within their operational perimeter. The officers were in plain clothes and did not identify themselves as members of law enforcement when they bear hugged Mr. Zetina. During the bear hug, Mr. Zetina removed a gun from his hoody and shot multiple deputies. This led to a firefight between Mr. Zetina and the BATTLE Defendants. At the end of the fight, one officer was dead, two other officers were wounded by gunfire, and a third had shrapnel wounds.

---

[2] Located at 4225 Galley Road, Colorado Springs, Colorado 80909.
[3] "Takedown" is law enforcement terminology for apprehension of a suspect.
[4] "Bear hug" is BATTLE-specific terminology for grabbing a suspect from behind while pinning the suspect's arms down.

Additionally, Mr. Villanueva, an innocent bystander, was shot in the back. He fell to the ground, unable to move any part of his body from the chest down. Mr. Villanueva suffered a thoracic spinal cord injury in multiple vertebras. He also suffered from multiple edemas and hemorrhages. These injuries caused Mr. Villanueva to become permanently paralyzed at the age of twenty-eight.

## JURISDICTION AND VENUE

1.      At all times relevant to this action, the Plaintiff, THOMAS VILLANUEVA (hereinafter "Plaintiff-VILLANUEVA") was a resident of El Paso County, Colorado and a citizen of the United States of America.

2.      At all times relevant to this action, Defendant El Paso County was authorized by law to maintain and did maintain a police department known as the El Paso County Sheriff's Office, which acted as its agents in the area of law enforcement.

3.      At all times relevant to this Complaint, Defendant Bill Elder was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under the color of law in his capacity as the Sheriff employed by the El Paso County Sheriff's Office.

4.      At all times relevant to this Complaint, Defendant Micah Flick was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under the color of law in his capacity as an officer employed by the El Paso County Sheriff's Office.

5.      At all times relevant to this Complaint, Defendant Scott Stone was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under the color of law in his capacity as an officer employed by the El Paso County Sheriff's Office.

4

6. At all times relevant to this Complaint, Defendant Tremaine White was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under the color of law in his capacity as an officer employed by the El Paso County Sheriff's Office.

7. At all times relevant to this Complaint, Defendant Stephanie Criss was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under the color of law in her capacity as an officer employed by the El Paso County Sheriff's Office.

8. At all times relevant to this Complaint, Defendant Michael Boggs was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under the color of law in his capacity as an officer employed by the El Paso County Sheriff's Office.

9. At all times relevant to this Complaint, Defendant John Watts was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under the color of law in his capacity as an officer employed by the El Paso County Sheriff's Office.

10. At all times relevant to this Complaint, Defendant Scott Stone was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under the color of law in his capacity as an officer employed by the El Paso County Sheriff's Office.

11. At all times relevant to this action, Defendant the City of Colorado Springs, Colorado was authorized by law to maintain and did maintain a police department known as the Colorado Springs Police Department, which acted as its agents in the area of law enforcement.

12. At all times relevant to this Complaint, Defendant Peter Carey was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under the color of law in his capacity as the Chief of Police employed by the Colorado Springs Police Department.

5

13.  At all times relevant to this Complaint, Defendant Kevin Miyakusu was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under the color of law in his capacity as an officer employed by the Colorado Springs Police Department.

14.  At all times relevant to this Complaint, Defendant Marcus Yanez was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under the color of law in his capacity as an officer employed by the Colorado Springs Police Department.

15.  At all times relevant to this Complaint, Defendant John Reindollar was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under the color of law in his capacity as an officer employed by the Colorado State Patrol.

16.  At all times relevant to this Complaint, Defendant Chad Hunt was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under the color of law in his capacity as an officer employed by the Colorado State Patrol.

17.  Plaintiff-VILLANUEVA's various civil rights claims under 42 U.S.C. § 1983 give rise to subject matter jurisdiction in this Court pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) and § 1343(a)(4) (civil rights).

18.  Venue in this action properly lies in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391, as all Defendants reside within this federal judicial district; all Defendant municipalities/localities are located within this district.  The events giving rise to this action took place at or near Colorado Springs, Colorado within this district.

## FACTUAL ALLEGATIONS
### A.  BEAT AUTO THEFT THROUGH LAW ENFORCEMENT – "BATTLE"

19.     The BATTLE team is composed of agents from multiple jurisdictions, including the Colorado Springs Police Department (hereinafter, "CSPD"), El Paso County Sheriff's Office (hereinafter, "EPCSO"), and Colorado State Patrol (hereinafter, "CSP"). BATTLE team members meet every Monday in a joint effort to look for and attempt to recover stolen vehicles.

20.     BATTLE detectives dress in plain clothes, drive undercover vehicles, and go out and proactively search for stolen cars. Once the detectives find a stolen car, detectives follow them until the suspect leaves the car. At that point, they try to apprehend the suspect for vehicular thief.

21.     Agencies requesting BATTLE activation must be able to assign a minimum of one investigator or detective to participate in BATTLE operations. This individual will serve as the case agent for the operation and may be provided with a co-supervisor.

22.     The Colorado State Patrol is the lead agency in BATTLE. The Captain of the Colorado State Patrol's Investigative Service Section is the BATTLE Project Director and Commander.

23.     The BATTLE Project Director is responsible for assuring that BATTLE has the equipment, training, and support necessary to carry out its mission.

24.     Liability for individual BATTLE members is the sole responsibility of each of the participating agencies or employees.

25.     The primary BATTLE Supervisor is a Colorado State Patrol Sergeant. This individual has field supervisory responsibility of all team members during BATTLE activities and must ensure that BATTLE Operational Guidelines are followed.

26.    BATTLE gathers intelligence on both organized and individual criminal activity on the local, state, and national levels.

27.    BATTLE requires thorough and thoughtful planning of undercover operations. Planning is considered the most important function of any undercover operation.

28.    Plans are created by using tactical-planning information, briefing sheets, surveillance reports, and other materials. The BATTLE briefing sheet must be completed prior to any undercover or tactical operation. If circumstances are time-sensitive, the briefing sheet may not be completed, but only with task force supervisor approval. The briefing sheet designates the supervisor for the operation, authorization for the raid, etc.

29.    Use of force must comply with all Colorado laws and the investigator's applicable department policies.

30.    In the planning and execution of an undercover operation, BATTLE detectives must give priority to the safety of ALL persons, including those who enter the scene or are already within the operational perimeter.

31.    If a BATTLE detective is involved in an enforcement activity and is contacted by a citizen, all efforts must be made to direct them to the on-scene supervisor. Information may be provided to the citizen without compromising the investigation.

32.    The Task Force Supervisor must make training recommendations to the Project Director. The Task Force Commander must approve all recommended training for Team members. The Project Director has the authority to approve and spend training funds budgeted to BATTLE.

33.    Investigators are required to have attire with 'Police," "Agent," "Sheriff," or "Trooper" markings during undercover operations.

34. CSP Troopers are required to use reasonable, necessary, and appropriate force when force is used to accomplish lawful objectives.

35. EPCSO officers are required to use reasonable, necessary, and appropriate force when force is used to accomplish lawful objectives.

36. CSPD officers are required to use reasonable, necessary, and appropriate force when force is used to accomplish lawful objectives.

37. It is standard practice for law enforcement agencies around the United States to secure the scene of a police operation.

38. It is standard practice for law enforcement agencies around the United States to apprehend non-violent suspects only when the risk to the public has been eliminated.

39. BATTLE Detectives are not trained nor required by BATTLE-specific directives to secure the scene of a police operation before conducting a "takedown."

40. BATTLE is required to protect the public and/or individuals in the operational perimeter of a takedown.

41. EPCSO is required to protect the public and/or individuals in the operational perimeter of a takedown and/or apprehension of a suspect.

42. CSPD is required to protect the public and/or individuals in the operational perimeter of a takedown and/or apprehension of a suspect.

43. CSP is required to protect the public and/or individuals in the operational perimeter of a takedown and/or apprehension of a suspect.

### B. BATTLE'S FEBRUARY 5, 2018 OPERATION PLAN

44. On February 5, 2018, the BATTLE team was comprised of eleven members: ten active, and one passive. Active members include: (1) **Sergeant Kevin Miyakusu**, CSPD (2)

9

**Officer Marcus Yanez**, CSPD; (3) **Investigator John Reindollar**, CSP; (4) **Sergeant Jacob Abendschan**, EPCSO; (5) **Deputy Micah Flick**, EPCSO; (6) **Deputy Scott Stone**, EPCSO; (7) **Deputy John Watts**, EPCSO; (8) **Deputy Tremaine White**, EPCSO; (9) **Deputy Stephanie Criss**, EPCSO; and (10) **Deputy Michael Boggs**, EPCSO (collectively, "BATTLE Defendants"). **Sergeant Chad Hunt**, CSP, was supporting the team remotely.

45.    On February 5, 2018, Sergeant Hunt created a BATTLE operation plan.

46.    The BATTLE Defendants were all dressed in plain clothes. Each had a police badge tucked in underneath their plain clothes. The only individual wearing a bulletproof vest with police insignia was Sergeant Miyakusu.

47.    BATTLE Defendants were partnered together in unmarked police vehicles. Sergeant Miyakusu and Investigator Reindollar were partnered together in a blue Infiniti sedan. Officer Yanez and Deputy Criss were partnered in a maroon Ford Explorer Sport Trac. Deputies Flick, Watts, and Stone were partnered in a white Nissan Armada. Finally, Sergeant Abendschan and Detectives White and Boggs were partnered in black Ford F150.

48.    After meeting at the Gold Hill Substation, each vehicle drove in different directions to look for stolen vehicles. BATTLE Defendants are given a "hot list" of stolen vehicles to lookout for. The hot list describes the make, model, and plate number of vehicles that are stolen.

49.    Sergeant Miyakusu and Investigator Reindollar located a stolen green 1999 Saturn (hereinafter, "Saturn") around 8:00 am. Sergeant Miyakusu placed a GPS tracking device on the Saturn after obtaining permission from the registered owner.

50.    The BATTLE Defendants and Sergeant Hunt monitored the GPS tracking device that was placed on the Saturn.

51.    BATTLE Defendants continued looking for stolen cars while waiting for the Saturn to begin moving.

52.    In the afternoon, the GPS tracker showed that the Saturn was moving. The BATTLE Defendants all separately drove to the area where the Saturn was located.

53.    Sergeant Abendschan and Detectives White and Boggs located the Saturn at a carwash. At this point, the Saturn was partially blue. The detectives saw the suspect, Mr. Zetina, spray painting the Saturn blue.

54.    Detective White called out over the radio a description of what Mr. Zetina was wearing. Mr. Zetina was a Hispanic man who was wearing a hoodie with the number "13" on it.

55.    The number 13 is identified by police as a gang symbol. The number is associated with the thirteenth letter of the alphabet, "M," and is known by police as a homage to the Mexican Mafia. Known gang members often wear clothing depicting their gang affiliation.

56.    Deputy Stone and his team members were concerned of Mr. Zetina's association with gangs.

57.    Deputy Yanez believed that Mr. Zetina's attire demonstrated that Mr. Zetina was not afraid to show that he was a gang member.

58.    In fact, Mr. Zetina was known by CSPD to be a member of the street gang "South Side Soldados," or "Triple S." Mr. Zetina was known to go by the gang moniker "Grumpy."

59. Mr. Zetina then left the car wash and drove to the Marquette Heights Apartments. Sergeant Abendschan and Sergeant Hunt monitored Mr. Zetina's movements on the computer using the GPS tracker, and communicated via radio where to go next.

60. After leaving the car wash, Mr. Zetina conducted multiple "burn moves[5]" to determine if law enforcement was following him. The BATTLE Defendants observed Mr. Zetina make burn moves, including driving through several neighborhoods before arriving at his destination.

61. The BATTLE Defendants set up a takeaway which is an operational perimeter in all directions. A BATTLE vehicle also goes into the operational perimeter to keep eyes on the suspect. The BATTLE Defendants set up a takeaway at the Marquette Heights Apartments[6] to monitor Mr. Zetina.

62. The BATTLE Defendants observed Mr. Zetina and another individual spray painted the Saturn blue in the driveway of the Marquette Heights Apartments.

63. After meeting with an individual, Mr. Phillip Kopf, Mr. Zetina drove away from Marquette Heights Apartments alone.

64. After leaving the Marquette Heights Apartments, Mr. Zetina again conducted multiple burn moves, including driving in circles throughout a residential area in an attempt to identify any law enforcement personnel following him.

65. Sergeant Abendschan and Deputies White and Boggs followed Mr. Zetina out of the Marquette Heights Apartments. The detectives and Mr. Zetina stopped at a stoplight, with

---

[5] "Burn Move" is a law enforcement term for the movements a suspect takes to identify whether law enforcement personnel is following them. Some maneuvers include driving through alleys, residential neighborhoods, and making U-turns.

[6] Some of the BATTLE detectives refer to these apartments as either the "Kit Carson Apartments" or the "Marquis Heights Apartments." However, the apartments all share the same address at 568 Marquette Drive, Colorado Springs, CO 80911.

a silver SUV between them. When the light turned green, Mr. Zetina stuck his left hand out of the window, raised his middle finger (making a crude gesture), and accelerated.

66.    Mr. Zetina then raced with the silver SUV, driving erratically. Mr. Zetina made numerous turns, which caused the BATTLE Defendants to lose sight of his vehicle. Mr. Zetina made his way to the Shannon Glen Apartments.[7] The BATTLE Defendants then set up another takeaway.

67.    At the Shannon Glenn Apartments, the BATTLE Defendants did not attempt to arrest Mr. Zetina because he was near his vehicle.

68.    Mr. Zetina then drove to the Murray Hill Apartment complex. The BATTLE Defendants also drove to the Murray Hill Apartments.

### C. BATTLE'S ACTIONS TO APPREHEND MANUEL ZETINA

69.    The BATTLE Defendants arrived at Murray Hill Apartments in the afternoon in their separate cars. Each BATTLE vehicle parked in a different spot at the apartment complex, establishing an operational perimeter around Mr. Zetina.

70.    The operational perimeter was located in the parking lot of the Murray Hill Apartments. The BATTLE Defendants located themselves in the corridor of the parking lot which runs east-west off North Murray Avenue. The BATTLE Defendants did not clear civilians from the operational perimeter or secure the operational perimeter at any point while they were at Murray Hill Apartments. *See* Exhibit A, Map of Murray Hill Apartments.

71.    After arriving in the complex, Deputy White walked into one of the apartment buildings to get a better view of Mr. Zetina. Deputy White walked in through a back entrance, up

---

[7] The address is 260 N Murray Boulevard, Colorado Springs, CO 80916.

13

the stairs, and then down another set of stairs to look through the glass front door. He could see Mr. Zetina from this vantage point.

72. Deputy White was providing information about Mr. Zetina to Deputy Boggs via telephone.

73. Deputy White observed Mr. Zetina sitting in the driver's seat of the Saturn. Deputy White told the other BATTLE Defendants that it looked like Mr. Zetina was smoking a pen. The BATTLE Defendants, including Sergeant Abendschan, believed that Mr. Zetina was smoking methamphetamines or some other type of illegal drug.

74. In fact, Mr. Zetina was smoking methamphetamines in the vehicle.

75. After smoking methamphetamines, Mr. Zetina walked into the apartment complex, and was on the phone. The cell phone was in his right hand when he walked into the apartment complex.

76. Deputy White then walked past Mr. Zetina's car and said via telephone to Deputy Boggs that the Saturn was empty. Deputy Boggs radioed this information to the other BATTLE Defendants.

77. Deputy White sat on the steps outside of one of the apartment buildings and continued to observe Mr. Zetina.

78. Deputy White told the team that it was a good time to takedown Mr. Zetina because he was alone and away from the Saturn.

79. Sergeant Miyakusu approved and gave the "go-ahead" to begin the takedown, even though he was behind one of the apartment buildings in the Murray Hill Apartments complex, and without eyes on the scene. Detective Boggs also affirmatively stated over the radio that the BATTLE Defendants should attempt a takedown of Mr. Zetina.

14

80.  Sergeant Miyakusu began directing units into the area to set up for the takedown of Mr. Zetina.

81.  Sergeant Miyakusu and Investigator Reindollar were behind the apartment building in case Mr. Zetina attempted to flee in that direction.

82.  Sergeant Miyakusu and Investigator Reindollar were in command of the operation, but were not able to see the scene, suspect, officers, or civilians.

83.  Mr. Zetina emerged from one of the apartment buildings and began walking west, towards both the BATTLE Defendants and towards North Murray Road.

84.  When Mr. Zetina came out of the apartment building, Deputy White noticed that Mr. Zetina had a cell phone in his left hand and his right hand was in his jacket pocket. Mr. Zetina's elbow was flexed, not relaxed.

85.  Based on Mr. Zetina's arm placement, Deputy White believed that Mr. Zetina was concealing a weapon.

86.  Deputy Stone saw Mr. Zetina's hand in his pocket, and also thought that the hand placement was abnormal.

87.  Even though Deputy White was in plain clothes, Mr. Zetina was staring very intently in his direction. Deputy White believed he thought Mr. Zetina knew he was a cop.

88.  Deputy White communicated to the other BATTLE Defendants that Mr. Zetina had a weapon in his hand. However, none of the detectives called off the takedown.

89.  Deputy White realized Mr. Zetina was staring intently at Deputies Flick and Stone, who were walking towards Mr. Zetina.

90. Officer Yanez observed Mr. Zetina move his arm and hand towards his hip while walking towards Detectives Flick and Stone. Officer Yanez believed Mr. Zetina was drawing his gun.

91. During the takedown, BATTLE Defendants were operating under an Operations Plan created by Sergeant Hunt.

92. Plaintiff-VILLANUEVA entered the Murray Hill Apartments parking lot from the west, off N. Murray Road. He was walking west towards his apartment building in the complex.

93. As he was walking towards his apartment building, Plaintiff-VILLANUEVA followed multiple BATTLE-Defendants. The BATTLE Defendants kept Mr. Villanueva in the operational perimeter, and allowed him to continue walking towards Mr. Zetina.

94. The BATTLE Defendants never identified themselves as law enforcement to Mr. Villanueva before attempting to apprehend Mr. Zetina.

95. Before Mr. Zetina was grabbed, Deputy Boggs saw Plaintiff-VILLANUEVA walking in the operational perimeter towards the takedown. Deputy Boggs allowed Mr. Villanueva to continue walking west towards the takedown, and kept Mr. Villanueva in the operational perimeter.

96. Before Mr. Zetina was grabbed, Deputy Criss saw Plaintiff-VILLANUEVA walking in the operational perimeter towards the takedown. She allowed Mr. Villanueva to continue walking west towards the takedown, and kept Mr. Villanueva in the operational perimeter.

97. Before Mr. Zetina was grabbed, Deputy Watts saw Plaintiff-VILLANUEVA walking in the operational perimeter towards the takedown. He allowed Mr. Villanueva to continue walking west towards the takedown, and kept Mr. Villanueva in the operational perimeter.

98. Before Mr. Zetina was grabbed, Officer Yanez saw Plaintiff-VILLANUEVA walking in the operational perimeter towards the takedown. He allowed Mr. Villanueva to continue walking west towards the takedown, and kept Mr. Villanueva in the operational perimeter.

99. Before Mr. Zetina was grabbed, Sergeant Abendschan saw Plaintiff-VILLANUEVA walking in the operational perimeter towards the takedown. He allowed Mr. Villanueva to continue walking west towards the takedown. Instead of stopping Mr. Villanueva, Sergeant Abendschan began walking towards Mr. Zetina.

100. Plaintiff-VILLANUEVA walked past Deputy White, continuing west towards Mr. Zetina.

101. Deputy Criss knew there would be other people, including civilians like Plaintiff-VILLANUEVA, in the parking lot.

102. Deputies Flick and Stone affirmatively grabbed at Mr. Zetina using a "bear hug." BATTLE uses the bear hug so that suspects cannot use their arms. Neither deputy had their gun or badge out when approaching Mr. Zetina. All of the officers were in plain clothes and were driving unmarked cars. Most of the officers were wearing bulletproof vests.

**D. BATTLE'S GUN FIGHT WITH MANUEL ZETINA AT THE MURRAY HILL APARTMENTS**

103. While Deputies Flick and Stone attempted to grab Mr. Zetina using a bear hug, Mr. Zetina brushed against Deputy Stone and began to lift his arm up in his pocket.

104. Deputy Stone then grabbed Mr. Zetina in a bear hug.

105. Mr. Zetina shot Deputy Stone in the left hip. At this time, Deputy Stone fell to the ground.

106. Mr. Zetina and Deputy Flick began to fight. Mr. Zetina then shot Deputy Flick.

107. Deputy Flick suffered life-threatening injuries and died because of the gunshot wound.

108.    The actions of Deputies Flick and Stone affirmatively began the firefight that ensued between the BATTLE Defendants and Mr. Zetina.

109.    While Mr. Zetina and Deputy Flick were wrestling, Officer Yanez attempted to approach the melee. He was shot in the groin by Mr. Zetina. Officer Yanez shot Mr. Zetina in the back.

110.    Mr. Zetina continued to shoot his gun. Deputy White approached and shot Mr. Zetina in the torso. Mr. Zetina became motionless. Mr. Zetina later died from injuries sustained during the gunfight.

## E. THOMAS VILLANUEVA

111.    On February 5, 2018 Plaintiff-VILLANUEVA was a resident of the Murray Hill Apartments.

112.    Plaintiff-VILLANUEVA bought sandwiches from a restaurant across the street from the apartment complex. Mr. Villanueva was walking west towards his apartment building in the operational perimeter when he walked past the BATTLE Defendants and Mr. Zetina.

113.    Plaintiff-VILLANUEVA saw the BATTLE Defendants but did not realize the BATTLE Defendants were members of law enforcement actively engaged in a takedown of an armed suspect.

114.    If fact, multiple civilians did not realize the BATTLE Defendants were members of law enforcement.

115.    Residents in the Murray Hill Apartments complex, who observed the entire chain of events, believed that a gang fight was happening in the parking lot. They did not know the BATTLE Defendants were members of law enforcement.

116.    During the fight, Plaintiff-VILLANUEVA was shot once by Mr. Zetina.

117. Plaintiff-VILLANUEVA fell to the ground after being shot. He was unable to use his legs or feel any sensation below his nipple line.

118. Plaintiff-VILLANUEVA suffered a gunshot wound through and through, which entered the left side of his body and exited the right. He was shot in the back. Because of these injuries, Mr. Villanueva is permanently paralyzed from the chest down at age twenty-eight.

119. The bullet caused a spinal cord injury to Plaintiff-VILLANUEVA's fourth thoracic vertebra. Additionally, Mr. Villanueva suffered from multiple acute, comminuted, and displaced fractures from the third to the sixth thoracic vertebras. The greatest height loss was at the fourth thoracic vertebra.

120. Plaintiff-VILLANUEVA suffered a spinal cord edema from the second to the sixth thoracic vertebras, with the most significant deformity at the fourth thoracic vertebra. Mr. Villanueva also suffered extensive posterior epidural hemorrhage throughout his thoracic canal, most significantly between the fourth and sixth thoracic vertebras. He also suffered a small amount of subarachnoid hemorrhage in the lower thoracic thecal sac.

121. Plaintiff-VILLANUEVA suffered burst fractures on his third and fourth thoracic vertebras. Multiple small fracture fragments and gas were present within the spinal canal.

122. The gunshot wound severed Plaintiff-VILLANUEVA's spine, leading to his paralysis and permanent inability to use his legs. Plaintiff-VILLANUEVA will require medical care and home health care for the remainder of his life.

123. Plaintiff-VILLANUEVA was shot because the BATTLE Defendants made critical and lethal mistakes leading up to and during the takedown, including not securing the operational perimeter; allowing a civilian to enter the operational perimeter; keeping a

civilian within the operational perimeter controlled by law enforcement during an active takedown; and continuing the takedown even though they knew Mr. Zetina was armed, while a civilian was in the operational perimeter.

124.    After the shooting, Plaintiff-VILLANUEVA contemplated suicide, in part because of the Defendants' lack of accountability and failure to take responsibility for Mr. Villanueva's injuries.

125.    Plaintiff-VILLANUEVA was forced to move back in with his parents after the shooting. He lost his job and has not been able to secure new employment, as he can no longer work. Mr. Villanueva has lost contact with friends, as he cannot "hang out" as he did before the shooting. Mr. Villanueva is not able to pursue hobbies such as skateboarding, which he enjoyed while his legs were usable. Mr. Villanueva cannot have sexual relationships. Mr. Villanueva suffered emotional harm, and now is scared to make decisions on his own. Because of the shooting, Mr. Villanueva has lost the independence and confidence that made him a successful, self-sufficient member of the community.

### F. BATTLE'S FAILURE TO IDENTIFY THEMSELVES AS DETECTIVES

126.    Abigale Mason emerged from her apartment after the police shootout, brandishing a firearm. She pointed the gun at the BATTLE Defendants because she did not know they were police. She was concerned by the gunfire in the parking lot.

127.    There were no warnings given by the BATTLE Defendants prior to the attempted takedown. All commands came after the gunfire began.

128.    At the time of the takedown, no BATTLE detective displayed police insignia. Deputy Stone had his police badge on a chain around his neck, tucked into his shirt. Officer Yanez had his badge tucked underneath his plain clothes during the takedown.

20

129.   Deputy White never pulled his police badge out of his shirt during the takedown.

130.   During takedowns, at least one BATTLE detective is required to wear an "exterior vest," which identifies the individual as police. This is a bulletproof vest adorned with police emblems and must be worn outside of clothes.

131.   Sergeant Miyakusu was the only BATTLE detective wearing an exterior vest. However, the vest was under his jacket. As such, the police emblems were not visible. Sergeant Miyakusu's police badge was around his neck, tucked into his clothes. Additionally, Sergeant Miyakusu was behind an apartment building during the takedown, instead of in the parking lot. Sergeant Miyakusu could not see the parking lot from his vantage point. Consequently, none of Sergeant Miyakusu's police emblems and insignia were visible to Mr. Zetina.

132.   Sergeant Miyakusu did not want to let Mr. Zetina know that he was a law enforcement officer.

133.   None of the vehicles driven by the BATTLE Defendants were marked with police emblems.

134.   BATTLE Defendants agreed that the takedown of Mr. Zetina was a "big chaos moment."

## G. BATTLE'S LACK OF TRAINING

135.   BATTLE Defendants do not train together. They train with their respective police organizations.

136.   It is standard practice for officers of separate law enforcement agencies to train together if they will be working in the field together, or if they will be conducting an operation together.

137.    BATTLE Defendants are trained to grab using a bear hug without identifying themselves as law enforcement until after a suspect has been grabbed.

138.    It is standard practice for law enforcement to be trained to avoid contacting a suspect until the officer/officers has/have been identified as a member of law enforcement.

139.    BATTLE Defendants are not trained to secure the area of an anticipated operation, including undercover operations, to prevent civilians from entering the location.

140.    It is standard practice for law enforcement to be trained to secure the area of an anticipated operation, including undercover operations.

141.    BATTLE Defendants are not trained to secure the operational perimeter of an anticipated takedown to prevent civilians from entering the location.

142.    It is standard practice for law enforcement to be trained to secure the operational perimeter to prevent civilians from entering the operational perimeter.

143.    BATTLE Defendants are not trained to remove and/or secure civilians who are already within the operational perimeter of an anticipated takedown.

144.    It is standard practice for law enforcement to be trained to remove and/or secure civilians who are already within the operational perimeter of an anticipated takedown.

145.    BATTLE Defendants are not trained on how to properly protect civilians, who are under their control, once they enter an operational perimeter.

146.    It is standard practice for law enforcement to be trained to protect civilians who are within an operational perimeter.

147.    BATTLE Defendants are not trained to call off a takedown if they believe that the suspect is armed and dangerous and/or if there is a risk to the public.

148.    It is standard practice for law enforcement to be trained to call off an operation if the suspect is armed and dangerous and/or if there is a risk to the public.

149.    BATTLE Defendants are not instructed on de-escalation techniques when performing a takedown of a suspect.

150.    It is standard practice for law enforcement to be trained on de-escalation techniques when apprehending a suspect.

151.    BATTLE Defendants are not trained to identify gang members.

152.    It is standard practice for law enforcement to be trained how to identify gang members.

**COUNT ONE**
State-Created Danger - 42 U.S.C. § 1983
(Against Defendants Flick, Stone, Abendschan, Watts, White, Criss, Boggs, Miyakusu, Yanez, Reindollar, and Hunt in Individual Capacities)

153.    All preceding paragraphs are incorporated by reference as though fully set forth herein.

154.    This Count arises under 42 U.S.C. § 1983, and is alleged against BATTLE detective Defendants Flick, Stone, Abendschan, Watts, White, Criss, Boggs, Miyakusu, Yanez, Reindollar, and Hunt, (hereinafter, "BATTLE Defendants") in their individual capacities, for their command and/or supervisory directives causing, and or knowingly acquiescing in commanded personnel's causing, the deprivation of Plaintiff-VILLANUEVA's constitutional rights to life, liberty, and personal security under the Fourteenth Amendment to the United States Constitution.

155.    At all relevant times, such Defendants were acting under the color of the laws of the State of Colorado.

156.    Plaintiff-VILLANUEVA was shot during a BATTLE-initiated "takedown" of Manuel Zetina, a suspected car thief.

23

157.    BATTLE Defendants followed the movements of Mr. Zetina in a stolen 1999 Saturn using police surveillance and GPS tracking. During this time, Mr. Zetina made numerous vehicular maneuvers to evade the police, including "burn runs."

158.    BATTLE Defendants were aware that Mr. Zetina was the member of a street gang. Defendants noticed Mr. Zetina wearing a hoodie with the number "13" on it. Defendants knew that his number is associated with the thirteenth letter of the alphabet, "M," and is a symbol of the Mexican Mafia.

159.    BATTLE Defendants did not apprehend Mr. Zetina in multiple locations throughout the day, including at the Marquis Heights Apartments and Shannon Glen Apartments, because they were worried about safety.

160.    BATTLE Defendant decided to apprehend Mr. Zetina at the Murray Hill Apartments at approximately 3:30 p.m. Defendants positioned themselves in various places in the complex's parking lot. At this time, Defendants affirmatively allowed individuals to walk through the parking lot.

161.    Sergeant Miyakusu affirmatively gave the "go-ahead" to begin the takedown operation, even though he could not see the scene and Deputy White had notified the team that Mr. Zetina was armed.

162.    Multiple BATTLE Defendants saw Mr. Zetina's hand in his pocket at an odd angle and knew that Mr. Zetina was concealing a gun or other weapon. Additionally, multiple Defendants felt that Mr. Zetina was staring at them intently, in an uneasy manner.

163.    BATTLE Defendants affirmatively gave orders to begin the takedown, even though Deputy White aired over multiple channels of communication that Mr. Zetina was armed.

164. Plaintiff-VILLANUEVA began walking through the parking lot at Murray Hill Apartments before the takedown began. He was walking east towards his apartment complex. BATTLE Defendants White, Abendschan, Watts, Boggs, Criss, and Yanez watched Mr. Villanueva walk through the operational perimeter and kept him in the operational perimeter without stopping him or warning him of the takedown.

165. BATTLE Defendants increased Plaintiff-VILLANUEVA's vulnerability to being shot by affirmatively instructing the takedown to occur, and by keeping Mr. Villanueva within the operational perimeter of the takedown.

166. Plaintiff-VILLANUEVA was a civilian in the operational perimeter. He was not a member of any police organization, nor was he a member of the general public. Instead, Mr. Villanueva was part of a limited and specifically identifiable group of apartment dwellers at the Murray Hill Apartments. Specifically, Mr. Villanueva was a resident of the Murray Hill Apartment complex who was returning home after buying lunch from a nearby restaurant.

167. The BATTLE Defendants controlled the operational perimeter. The BATTLE Defendants had operational control over everything and everyone within the operational perimeter. Upon allowing Plaintiff-VILLANUEVA to enter the operational perimeter, the BATTLE Defendants took control over Mr. Villanueva.

168. BATTLE Defendants' affirmative actions placed Plaintiff-VILLANUEVA at substantial risk of serious, immediate, and proximate harm. The Defendants' actions proximately caused Mr. Villanueva to suffer a paralyzing gunshot wound to the back. Mr. Villanueva's spinal cord was severed as a result of the gunshot wound to his back. Because of his injuries, Mr. Villanueva will need medical care and home health care for the rest of his

life. Additionally, Mr. Villanueva has lost his job, his independence, and the ability to care for himself.

169.    BATTLE Defendants abused their authority by acing with deliberate indifference to, and with reckless, willful, and callous disregard for, the known substantial risk of Plaintiff-VILLANUEVA's injuries, in deprivation of his constitutional rights, which is shocking to the conscience.

170.    For the foregoing deprivations of Plaintiff-VILLANUEVA's constitutional rights to life, liberty, and personal security, BATTLE Defendants are liable in their individual capacities for compensatory and punitive damages, as well as reasonable attorney's fees and costs under 42 U.S.C. § 1988, which amounts will be proven at trial.

171.    Plaintiff-VILLANUEVA demands judgement against BATTLE Detective Defendants Flick, Stone, Yanez, Abendschan, Watts, White, Criss, Boggs, Miyakusu, Reindollar, and Hunt, jointly and severally, as follows: (1) compensatory damages in an amount to be determined, which amount shall be proven at trial; (2) punitive damages in an amount to be determined, which amount shall be proven at trial; (3) reasonable attorney's fees and costs under 42 U.S.C. § 1988; (4) pre- and post-judgment interest; (5) costs; and (6) such other and further relief that this Court deems proper.

**COUNT TWO**
Failure to Train - 42 U.S.C. § 1983
(Against Defendants El Paso County Sheriff's Office, Elder, Abendschan, Colorado Springs Police Department, Carey, and Miyakusu)

172.    All preceding paragraphs are incorporated by reference as though fully set forth herein.

173.    This Count arises under 42 U.S.C. § 1983, and is alleged against Defendants El Paso County Sheriff's Office, Sheriff Bill Elder, Sergeant Jacob Abendschan ("Sheriff's Department"), Colorado Springs Police Department, Chief of Police Peter Carey, Sergeant

26

Kevin Miyakusu   ("Colorado Springs Police), (Sheriff's Department and Colorado Springs Police, "Municipal Defendants") in their official capacities, arising from the acts of Sheriff Bill Elder, Sergeant Jacob Abendschan, Chief of Police Peter Carey, and Sergeant Miyakusu, whose policies and training procedures caused the deprivation of Plaintiff-VILLANUEVA'S constitutional rights to life, liberty, and personal security under the Fourteenth Amendment to the United States Constitution.

174.    At all times relevant, such BATTLE Defendants were acting under color of the laws of the State of Colorado.

175.    Upon information and belief, BATTLE detectives did not train together, but were left to train with their respective agencies. The Municipal Defendants did not provide training on securing the area of an anticipated takedown, recognizing gang signs, or safe practices in apprehending a suspect.

176.    The Municipal Defendants were deliberately indifferent to the risk of constitutional harm this lack of training posed.

177.    BATTLE detectives takedown suspects each week, often in public places.

178.    As a direct and proximate cause of the Municipal Defendants' inadequate training, Plaintiff-VILLANUEVA suffered a gunshot wound to the back that left him paralyzed from the chest down and was thereby deprived of his Fourteenth Amendment rights to life, liberty, and personal security.

179.    Municipal Defendants are jointly and severally liable to Plaintiff-VILLANUEVA for compensatory damages arising from the failure to train the BATTLE Defendants, constituting deliberate and conscious-shocking indifference to the constitutional rights of Mr. Villanueva.

27

180. Plaintiff-VILLANUEVA demands judgment against Municipal Defendants, jointly and severally, as follows: (1) compensatory damages in an amount to be determined, which amount shall be proven at trial; (2) reasonable attorney's fees and costs under 42 U.S.C. § 1988; (3) pre- and post-judgment interest; (4) costs; and (5) such other and further relief that this Court deems proper.

**COUNT THREE**
WILLFUL AND WANTON NEGLIGENCE
(Against All Defendants)

181. All preceding paragraphs are incorporated by reference as though fully set forth herein.

182. This Count arises under Colorado common law and is alleged against all Defendants.

183. At all relevant times, Defendants had a duty to protect the public. In particular, Defendants owed Plaintiff-VILLANUEVA this duty on February 5, 2018.

184. BATTLE Defendants breached this duty by allowing Plaintiff-VILLANUEVA to enter, and keeping him within, the operational perimeter of a takedown of a violent, armed gang member. Defendants further breached this duty to Mr. Villanueva by not securing the operational perimeter before attempting to takedown Mr. Zetina.

185. Plaintiff-VILLANUEVA was shot by Mr. Zetina. The bullet caused Mr. Villanueva's spine to be severed, leading to paralysis from the chest down and permanent inability to use his legs. Plaintiff-VILLANUEVA will require medical care and home health care the remainder of his life. Plaintiff-VILLANUEVA has lost the ability to work or engage in social activities.

186. The BATTLE Defendants caused Plaintiff-VILLANUEVA's injuries by attempting to apprehend Mr. Zetina, an armed gang member, without securing the scene or protecting Mr. Villanueva.

187. The Defendants' conduct described herein was willful and wanton, in that in that it was committed purposefully and under circumstances that each Defendant must have realized as dangerous, done heedlessly and recklessly, without regard to the consequences, or the rights and safety of others, particularly Plaintiff-VILLANUEVA.

188. As described above, Defendants' breach caused and proximately caused damages to Plaintiff-VILLANUEVA.

## **COUNT FOUR**
### VICARIOUS LIABILITY AND *RESPONDEAT SUPERIOR*
(Against Defendants El Paso County Sheriff's Office and Colorado Springs Police Department)

189. All preceding paragraphs are incorporated by reference as though fully set forth herein.

190. This Count arises under Colorado common law and is alleged the El Paso County Sheriff's Office and Colorado Springs Police Department Defendants.

191. At all relevant times, the BATTLE Defendants were employees and/or agents of either Defendant El Paso County Sherriff's Office or Defendant Colorado Springs Police Department, and were acting within the course and scope of their employment/agency.

192. Defendants El Paso County Sheriff's Office and Colorado Springs Police Department are liable for the actions of their respective employees/agents pursuant to vicarious liability and *Respondeat Superior* law for Plaintiff-VILLANUEVA's injuries and damages.

193. By virtue of the BATTLE Defendants being an employee and/or agent of Defendants El Paso County Sheriff's Office or Colorado Springs Police Department, and because they were acting within the course and scope of their employment and authority at the time of the above-referenced incidents, the acts and omissions of the BATTLE Defendants are deemed the acts and omissions of Defendants El Paso County Sheriff's Office and Colorado Springs Police Department pursuant to the doctrine of *Respondeat Superior*.

194.    Defendants El Paso County Sherriff's Office and Colorado Springs Police Department are

vicariously liable for the acts of their respective employees/agents pursuant to *Respondeat*

*Superior* law as a proximate cause of Plaintiff's injuries and damages.

195.    Plaintiff is entitled to any and all damages pursuant to Colorado law.

**JURY TRIAL DEMAND**

**Plaintiff-VILLANUEVA hereby demands a trial by jury with respect to each of the claims alleged herein.**

Respectfully submitted February 1, 2019.

Respectfully submitted,

*/s/ Joseph Ramos*
Joseph Ramos, Esq., M.D.
*/s/ Brian Calandra*
Brian Calandra, Esq.
*/s/ Colleen T. Calandra*
Colleen T. Calandra, Esq.
*/s/ Rebekah Stern*
Rebekah Stern, Esq.
Ramos Law
3000 Youngfield Street
Wheat Ridge, CO 80215
Phone Number: (303) 733-6353
Fax Number:   (303)865-5666
Email: joe@ramoslaw.com
        brian@ramoslaw.com
        colleen@ramoslaw.com
        rebekah@ramoslaw.com

*/s/ Scott Hooper*
Scott Hooper, Esq.
2929 Allen Parkway, 39th Floor
Houston, TX 77019
Phone Number: (713) 529-5055
Email: shooper@shooperlaw.com

30