## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.  1:19-cv-00295-PAB-KMT

THOMAS VILLANUEVA

      Plaintiff,

v.

EL PASO COUNTY;
BILL ELDER, Sheriff, El Paso County Sheriff's Office, in his official capacity;
The Estate of MICAH FLICK, Deputy, El Paso County Sheriff's Office, in his individual
capacity;
SCOTT STONE, Deputy, El Paso County Sheriff's Office, in his individual capacity;
JACOB ABENDSCHAN, Sergeant, El Paso County Sheriff's Office, in his official and
individual capacities;
JOHN WATTS, Detective, El Paso County Sheriff's Office, in his individual capacity;
TREMAINE WHITE, Detective, El Paso County Sheriff's Office, in his
individual capacity;
STEPHANIE CRISS, Detective, El Paso County Sheriff's Office, in her individual capacity;
MICHAEL BOGGS, Detective, El Paso County Sheriff's Office, in his individual capacity;
THE CITY OF COLORADO SPRINGS, COLORADO,
PETER CAREY, Chief of Police, Colorado Springs Police Department, in his official capacity;
KEVIN MIYAKUSU, Sergeant, Colorado Springs Police Department, in his official and
individual capacities;
MARCUS YANEZ, Officer, Colorado Springs Police Department, in his individual capacity;
JOHN REINDOLLAR, Investigator, Colorado State Patrol, in his individual capacity; and
CHAD HUNT, Sergeant, Colorado State Patrol, in his individual capacity

Defendants.

---

### RESPONSE TO DEFENDANTS' JOINT MOTION TO DISMISS ECF NO. 40

---

      Plaintiff, by and through his counsel, hereby submits his Response to Defendants' Joint

Motion to Dismiss and respectfully requests this Court deny Defendants' Joint Motion to Dismiss.

# I.   **INTRODUCTION**

On February 5, 2018 Thomas Villanueva left his apartment building and walked across the street to buy a sandwich for lunch.  While walking back to his apartment, Mr. Villanueva was permitted to walk through an operational perimeter established by undercover officers from three agencies: the Colorado State Patrol, the El Paso County Sheriff's Office, and the Colorado Springs Police Department.  The undercover officers were acting through a joint task force known as Beat Auto Theft Through Law Enforcement, or "BATTLE."  The officers knew Mr. Villanueva was within the operational perimeter at the time the decision was made to arrest a suspected car thief, Manuel Zetina.  The officers grabbed Mr. Zetina using a "bear hug," even though Mr. Villanueva was under their operational control within operational perimeter, a zone of danger, and knowing that Mr. Zetina was armed, intoxicated on methamphetamines, and a known gang member.  When Officers Flick and Stone grabbed Mr. Zetina, he began shooting his gun randomly and rapidly.  The officers responded in kind.  When the firefight was over, Mr. Villanueva was on the ground, unable to move any part of his body below the chest.  He had been shot through his spinal cord, which led to permanent paralysis at the age of twenty-eight.  Officer Flick tragically lost his life on the same day.

Officers Abendschan, Watts, White, Criss, Boggs, Miyakusu, Yanez, Reindollar, and Hunt (collectively, "BATTLE Defendants") had tracked Mr. Zetina from 8:00 a.m. to 3:30 p.m on February 5, 2018.  While tracking Mr. Zetina, the BATTLE Defendants made numerous decisions about when and where to apprehend the suspect.  They deliberated the choices, strategies and risk at numerous points in the day, ultimately deciding to grab Mr. Zetina using a "bear hug" without any weapons drawn.  These officers created the operational perimeter and kept Mr. Villanueva

within it.  By doing so, the officers created the very danger that cost Mr. Villanueva the use of his body for the rest of his life.

Mr. Villanueva sued (1) the BATTLE Defendants individually for a violation of Plaintiff's Fourteenth Amendment substantive due process rights under a state-created danger theory, and (2) El Paso County, Sheriff Bill Elder, Sergeant Jacob Abendschan, The City of Colorado Springs, Chief Peter Carey, and Sergeant Kevin Miyakusu in their official capacities for municipal liability for failure to train.[1]

Defendants brought a Joint Motion to Dismiss under Federal Rule of Civil Procedure 12 (b)(1) and 12(b)(6).[2]  For the foregoing reasons, Plaintiff's Complaint is legally sufficient to state a claim for which relief may be granted because it plausibly alleges cognizable violation of his constitutional rights that can survive qualified immunity as well as a failure to train claim. Accordingly, Defendants' Joint Motion to Dismiss should be denied.

## II.     STATEMENT OF FACTS

The Beat Auto Theft Through Law Enforcement ("BATTLE") team is composed of agents from the Colorado Springs Police Department, El Paso County Sheriff's Office, and Colorado State Patrol.  (Compl. ¶ 19.)  The BATTLE team attempts to recover stolen vehicles.  (*Id.*)  On February 5, 2018 the BATTLE team was comprised of eleven members: (1) Sergeant Kevin Miyakusu; (2) Officer Marcus Yanez; (3) Investigator John Reindollar; (4) Sergeant Jacob

---

[1] Plaintiff voluntarily dismissed his Third and Fourth claims for willful and wanton negligence against all Defendants and vicarious liability and *respondeat superior* against the County and City pursuant to Fed. R. Civ. P. (a)(1)(A)(i) as the dismissal occurred before the opposing parties served an answer or motion for summary judgment.  *See* ECF No. 45.  These claims were dismissed after Defendants' Joint Motion to Dismiss was filed but prior to filing the instant Response.  *Id.*

[2] Defendants' arguments for a motion pursuant to Rule 12(b)(1) applied only to the dismissed Third and Fourth claims.

Abendschan; (5) Deputy Micah Flick; (6) Deputy Scott Stone; (7) Deputy John Watts; (8) Deputy Tremaine White; (9) Deputy Stephanie Criss; (10) Deputy Michael Boggs; and (11) Sergeant Chad Hunt.  (*Id*. ¶ 44.)

At approximately 8:00 a.m. on February 5, 2018, Officers Miyakusu and Reindollar located a stolen green 1999 Saturn.  (*Id*. ¶ 49.)  A GPS device was placed on the Saturn and the BATTLE Defendants monitored the Saturn's location.  (*Id*. ¶¶ 49-50.)  The officers observed Mr. Manuel Zetina with the Saturn.  (*Id*. ¶ 53.)  The BATTLE Defendants observed Mr. Zetina wearing clothing adorned with a gang symbol and smoking methamphetamines.  (*Id*. ¶¶ 54-55, 73.) The BATTLE Defendants followed Mr. Zetina to multiple locations, including a carwash, Marquette Heights Apartments, Shannon Glen Apartments, and, finally, the Murray Hill Apartment complex.  (*Id*. ¶¶ 53, 59, 66, 68.)

Upon arrival at the Murray Hill Apartment complex, the BATTLE Defendants established an operational perimeter around Mr. Zetina in the parking lot of the complex.  (*Id*. ¶¶ 69-70.) The BATTLE Defendants located themselves in the corridor of the parking lot which runs east-west off North Murray Avenue.  (*Id*. ¶ 70.)

The officers began observing Mr. Zetina and communicated the observations to each other. *Id*. ¶¶ 71-77, 84-88.  Because Mr. Zetina was alone and away from the Saturn, Officers Miyakusu and White stated that the BATTLE Defendants should attempt to "take down" Mr. Zetina.  (*Id*. ¶¶ 78-79.)  Officer Miyakusu ordered the unit into the operational perimeter to take down Mr. Zetina while Mr. Villanueva was inside it.  (*Id*. ¶ 80, 161.)

Officers Boggs, Criss, Watts, Yanez, and Abendschan saw Mr. Villanueva enter the operational perimeter.  (*Id*. ¶¶ 93-101.)  The BATTLE Defendants had operational control over everything and everyone in their perimeter.  (*Id*. ¶¶ 93, 167.)  Mr. Zetina was armed.  (*Id*. ¶¶ 84-

88.)  Deputy White told the other BATTLE Defendants that Mr. Zetina was armed.  (*Id*. ¶88.)

Officers Flick and Stone attempted to grab Mr. Zetina using a bear hug.  (*Id*. ¶¶ 103-104.) Officers

Flick and Stone were in plain clothes and did not have their weapons drawn when they grabbed

Mr. Zetina.  (*Id*. ¶ 103.)  Mr. Zetina began shooting his gun.  (*Id*. ¶ 105.)  Officer Stone, Officer

Flick, Officer Yanez, and Mr. Villanueva were all shot by Mr. Zetina.  (*Id*. ¶¶ 105-106, 109, 116.)

Officer Flick died from his injures.  (*Id*. ¶ 107.)  Mr. Villanueva was paralyzed by the gunshot

wound.  (*Id*. ¶ 118.)

### III.    <u>STANDARD OF REVIEW</u>

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege enough factual

matter that, taken as true, makes the plaintiff's claim to relief plausible on its face.  *Estate of*

*Goodwin by and through Alvarado v. Connell*, -- F. Supp. 3d --, No. 17-cv-01124-PAB-SKC, 2019

WL 1170547, at *3 (D. Colo. Mar. 19, 2019) (citations and internal quotations omitted).  A

complaint must contain either direct or inferential allegations respecting all the material elements

necessary to sustain a recovery under some viable legal theory.  *Id*.  (Citing *Bryson v. Gonzales*,

534 F. 3d 1282, 1286 (10th Cir. 2008)). Federal Rule of Civil Procedure 8 requires "a short and

plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. (8)(a)(2).

Rule 8(a)'s "short and plain statement" mandate requires that a plaintiff allege enough factual

matter that, taken as true, makes his "claim to relief ... plausible on its face."  *Bryson v. Gonzales*,

534 F.3d 1282, 1286 (10th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127

S.Ct. 1955, 167 L.Ed.2d 929 (2007).

The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the

parties might present at trial, but to assess whether the plaintiff's complaint alone is legally

sufficient to state a claim for which relief may be granted."  *Dubbs v. Head Start, Inc.*, 336 F.3d

1194, 1201 (10th Cir. 2003). In doing so, the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB–TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007). Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Kuyper v. Bd. of Cty. Commr's of Weld Cty., Colo.*, No. Civ 09-cv-00342-PAB-MEH, 2010 WL 1287534, at *2 (D. Colo. Mar. 30, 2010) (citing *Erikson v. Pardus,* 551 U.S. 89, 93 (2007)). The "plausibility" standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible. *Id.* (Citation omitted).

## IV.   LEGAL ARGUMENT

### A.   DEFENDANTS' AFFIDAVIT AND AUDIO RECORDING MUST NOT BE CONSIDERED IN DETERMINING A MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) AND THIS COURT'S PRACTICE STANDARDS.

In support of their Motion, Defendants submitted an affidavit of Attorney Dan May as well as an audio recording of the February 5, 2018 BATTLE Operation Radio. *See* ECF. No. 40-1, 40-2. As set forth under the Standard of Review, Section III *supra*, Fed. R. Civ. P. 12(b)(6) the court's function on a Rule 12(b)(6) motion is ***not to weigh potential evidence*** that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs,* 336 F.3d at 1201.

Additionally, Defendants fail to comply with this Court's Civil Practice Standards, Section III, paragraph F, subsection 2(iii), wherein the Court states that if matters outside the pleadings are submitted in support of a Rule 12(b) motion, the party should discuss whether the 12(b) motion should be converted to a summary judgment motion. Defendants have failed to do so.

Accordingly, Defendants' inclusion of the affidavit of District Attorney Dan May as well as an audio recording are improper and should not be considered by this Court in determining Defendants' Motion to Dismiss.  *See* ECF Nos. 40-1 and 40-2.

**B.      PLAINTIFF'S FIRST CLAIM FOR RELIEF PLAUSIBILY ALLEGES A CONSTITUTIONAL VIOLATION UNDER THE DOCTRINE OF STATE-CREATED DANGER.**

Plaintiff's Complaint plausibly alleges cognizable violation of Mr. Villanueva's constitutional rights.  While Mr. Villanueva's factual scenario is one of first impression, the created danger doctrine is uniquely applicable here.  In keeping Mr. Villanueva in their perimeter, the officers in question must be held responsible for his safety.  To find otherwise would set an atrocious precedent permitting officers to be deliberately indifferent to the safety of civilians kept in their operational perimeter when taking down a non-threatening felon.

The Fourteenth Amendment provides that no state shall deprive "any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XVI, § 1.  While the state is generally not obligated to protect individuals against private violence, there are two exceptions: (1) the special relationship doctrine, and (2) the state-created danger doctrine.  *Sanders v. Bd. of Cnty. Comm'rs of Cnty. of Jefferson, Colo.*, 192 F. Supp. 2d 1094, 1107-08 (D. Colo. 2001) (citing *Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995)).  Here, Plaintiff relies on the doctrine of state-created danger.  (Compl. ¶¶ 23-26.)

To establish a constitutional violation under a state-created danger theory, the plaintiff must establish two preconditions: (1) the actor engaged in some affirmative action that (2) led to private violence.  *Waugh v. Dow*, 617 F. App'x 867, 871 (10th Cir. 2015).  If these preconditions are met, the plaintiff must establish six elements:

1. the charged state actor created the danger or increased plaintiff's vulnerability to the danger in some way;

2.  plaintiff was a member of a limited and specifically identifiable group;
3.  defendant's conduct put plaintiff at substantial risk of serious, immediate, and proximate harm;
4.  the risk was obvious or known;
5.  defendant acted recklessly in conscious disregard of that risk; and
6.  such conduct, when viewed in total, is conscious shocking.

*Id*.

Defendants argue that Plaintiff has not established the affirmative action pre-condition nor the sixth element of the state-created danger test, "shocks the conscious." (Defs. Mtn. to Dismiss, pp. 11, 13.) For the reasons set forth below, Plaintiff has sufficiently pled that Defendants acted affirmatively, and their conduct shocks the conscious; thus, Plaintiff has stated a violation under the doctrine of state-created danger upon which relief can be granted.

### 1.  *Plaintiff Plausibly Alleges an Affirmative Act With Respect to All Defendants.*

"If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into the snake pit." *Bowers v. DeVito*, 686 F.3d 616, 618 (7th Cir. 1982). On February 5, 2018 Defendants threw Mr. Villanueva into the metaphorical snake pit. (Compl. ¶¶ 93, 95-98.)

Plaintiff alleges the following affirmative acts: (1) Officers White and Miyakusu gave the go-ahead for the takedown to begin (*Id*. ¶¶ 78-79, 165); (2) Defendants created the operational perimeter while Mr. Villanueva was present (*Id*. ¶¶ 69-70); (3) Defendants controlled everything and everyone within the operational perimeter, including Mr. Villanueva (*Id*. ¶ 167.); Defendants had operational control over Mr. Villanueva and allowed him to be present in the operational perimeter (*Id*. ¶¶ 93, 95-101); (5) Officers Flick and Stone grabbed Mr. Zetina using a "bear hug." (*Id*. ¶ 103-104); and (6) Officer Hunt created the BATTLE operations plan the Defendants followed. (*Id*. ¶ 91.)

In every case where the Tenth Circuit found it appropriate to apply the doctrine of state-created danger, "the victims were unable to care for themselves or had had limitations imposed on their freedom by state actors." *Estate of Reat v. Rodriguez*, 824 F.3d 960, 967 (10th Cir. 2016). A state actor affirmatively acts when "they place an individual in a position of danger, effectively stripping a person of his ability to defend himself…." *Sanders*, 192 F. Supp. 2d at 1111 (citing *Armijo v. Wagon Mound Pub. Schs.*, 159 F.3d 1253, 1263 (10th Cir. 1998). The environment created by the state actor must be dangerous, the state actor must know it is dangerous, and to be liable, the state actor must have used their authority to create an opportunity that would not otherwise have existed for the *third-party's [acts] to occur. Id.* (Emphasis original).

Defendants frame their argument as if this case is about a "failure to act." (Defs. Mtn. to Dismiss, p. 12.)   However, it is Defendants' countless affirmative actions that led to Mr. Villanueva's catastrophic injury.[3]  Here, Plaintiff's Complaint plausibly states that the government created a dangerous situation without warning or protection, and Mr. Villanueva was paralyzed solely because he was placed in that dangerous situation by the state.  (Compl. ¶¶ 70, 93, 118-123.)

### i.      Plaintiff's Complaint Plausibly States Officers Stone and Flick Acted Affirmatively.

Defendants argue Plaintiff failed to establish the affirmative act precondition to all Defendants except Officers Stone and Flick.  *See* ECF No. 40.  Failure to raise an issue in an

---

[3] This is not a "failure to act" case.  Plaintiff does not seek an interpretation of the law that is inconsistent with *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989).  Similarly, Plaintiff is not asking this Court to impose an affirmative obligation on the state to prevent private citizens from harming one another on their own volition.  Plaintiff *is* seeking an interpretation of the law in a very limited context: where law enforcement officials conduct operations to apprehend non-threatening felons in non-emergency situations, they must not create danger to civilians, such as Mr. Villanueva, who are kept within their operational perimeters with no path to safety or ability to defend himself.  *Sanders,* 192 F. Supp. 2d, 1111 (citing *Armijo,* 159 F.3d at 1263.

opening brief waives that issue. *Guttman v. Silverberg*, 167 F. App'x 1, 4 (10th Cir. 2005) (citing *St. Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994)). Accordingly, Defendants concede that Officers Stone and Flick acted affirmatively in causing Mr. Villanueva's injuries.

### ii. *Plaintiff's Complaint Plausibly States Officers White and Miyakusu Acted Affirmatively.*

The state actor must act affirmatively in placing the victim in danger. *Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 921 (10th Cir. 2012). Affirmative conduct for purposes of Section 1983 should typically involve conduct that imposes an immediate threat of harm, which by its nature has a limited range and duration…. Moreover, the conduct should be directed at a discrete plaintiff rather than at the public at large. *Id.* at 920. (Citation omitted). *See also Ruiz v. McDonnell*, 299 F.3d 1173, 1183 (10th Cir. 2002). Here, Plaintiff's Complaint sufficiently pled that Officers White and Miyakusu acted affirmatively to place Mr. Villanueva in immediate harm.

More specifically, Plaintiff sufficiently pleads all the officers, including Officers White and Miyakusu, knew that Mr. Zetina was a dangerous gang member. (Compl. ¶¶ 54-58.) They also watched him smoke methamphetamines in the stolen Saturn. (*Id.* ¶¶ 73-74.) These characteristics alone made Mr. Zetina a danger to the public – something the BATTLE Defendants were cognizant of. (*Id.* ¶¶ 54-58, 73-74.) This fact is undeniable as shown by the unit's decision to dress with bulletproof vests under their street clothes. (*Id.* ¶ 102.)

Plaintiff also sufficiently pled that Deputy White followed Mr. Zetina to determine whether he could be apprehended. (*Id.* at ¶¶ 69-72.) White decided that it was a good time to "take down" Mr. Zetina and told the BATTLE Defendants as much. (*Id.* ¶¶ 76-78.) Sergeant Miyakusu then approved Officer White's decision and gave the "go-ahead" to begin the takedown. (*Id.* ¶ 79.) Sergeant Miyakusu then began directing the officers partaking in the takedown. (*Id.* ¶ 80.) The

BATTLE Defendants controlled everything and everyone in the operational perimeter. (*Id*. ¶ 167.) In having control over everyone in the operational perimeter, the BATTLE Defendants kept Mr. Villanueva inside the perimeter. (*Id*. 93.) Combined, these actions started the takedown of Mr. Zetina and created the operational perimeter.

Further, Plaintiff sufficiently pleads Officers White and Miyakusu knew that Mr. Zetina was a dangerous person and knew that it would be dangerous to apprehend him.[4] (*Id*. ¶ 102.) By directing officers to take down Mr. Zetina, Officers White and Miyakusu turned the operational perimeter into a battle-zone. (*Id*. ¶¶ 103-110.) Officers White and Miyakusu created the operational perimeter when they directed the other BATTLE Officers to their positions.[5] (*Id*. ¶¶ 69-70.)

In addition to the above-mentioned plausibly pled affirmative acts, Defendants did not clear civilians from the operational perimeter or secure the operational perimeter at any point while they were at Murray Hill Apartments. (*Id*. ¶ 70.) Establishing an operational perimeter that is not secure creates or enhances danger to civilians like Mr. Villanueva. (*Id*. ¶¶ 111-125.) Similarly, starting an operation while a civilian is present inherently enhances the danger to that civilian. *See generally Valdez v. Macdonald*, No. 15-cv-00109-RPM, 2019 WL 1651857, at *2 (D. Colo. Apr. 17, 2019) (where civilians were in danger in the residential neighborhood where a police operation was occurring.) *See also Brown v. Whitman*, 651 F. Supp. 2d 1216 (D. Colo. 2009) (requiring police to account for innocent bystanders before deploying a police dog without a leash.) *U.S. v.*

---

[4] Not only is it common sense that danger is afoot while apprehending an intoxicated gang member, Defendants wore bullet proof vests under their plain clothes because they knew the situation could become violent. (Compl. at ¶ 102.)

[5] Plaintiff avers the operational perimeter extended throughout the parking lot where the officers were located. The operational perimeter stretched from Officer Criss on the west to Officer Watts on the east and from Officer Boggs on the north to Officers Reindollar and Miyakusu to the south. *See* Exhibit A to Plaintiff's Complaint, ECF. No. 1-1.

*Eatman*, 460 F. App'x 790, 795-96 (10th Cir. 2012) (arresting a suspect "invites pursuit, escalation, and violence" which "presents a serious potential risk of physical injury to both the pursuing officers and bystanders") (internal quotations omitted).

It is the misuse of state authority, not the failure to use it, that potentially violates the Due Process Clause. *Fredericks v. Koehn*, No. 06-cv-00957-MS, 2007 WL 2890466, at *4 (D. Colo. Sept. 28, 2007). In *Fredericks*, defendants removed a suspect, who stalked and wanted to kill plaintiffs, from active GPS monitoring and failed to revoke his probation after he violated a restraining order dozens of times. *Id*. The court found that defendants failed to act by failing to revoke the suspect's probation and affirmatively acted by reducing the intensity of his supervision by downgrading his monitoring from active to passive. *Id*. at *6.

Here, Plaintiff has sufficiently pled that the officers affirmatively acted. (Compl. ¶¶ 154-170.) They misused their authority by making the decision to arrest an intoxicated gang member while Mr. Villanueva was in their operational perimeter. (*Id*. ¶¶ 93-98.) Defendants, including Officers White and Miyakusu, also knew that Mr. Zetina was armed. (*Id*. ¶¶ 161-162.) Officer White saw that Mr. Zetina was concealing a weapon and radioed as much to all of the officers before the "bear hug" took place. (*Id*. ¶¶ 85, 88.) Because he was armed, Mr. Zetina posed an immediate threat of harm. Nevertheless, Officers Flick and Stone attempted to grab him with a "bear hug" while Mr. Villanueva was in the operational perimeter. (*Id*. ¶¶ 100, 102.)

The instant case is analogous to *Kingsmill v. Szewczak*, 117 F. Supp. 3d 657, where an officer speaking to a civilian watched as an armed assailant approached the civilian and struck him over the head with a pipe. *Id*. The officer did nothing to warn the civilian nor did he stop the assailant. *Id*. Nevertheless, the officer was found to have affirmatively acted because he "affirmatively used his authority in a way that rendered him more vulnerable to danger than if the

officer had not acted at all." *Id*. at 666.  The officer had called the civilian over to talk – effectively interrupting the civilian's path and his method of defending himself.  *Id*. at 667.

In this case, the officers still affirmatively created a path of danger for Mr. Villanueva and kept him there.  (Compl. ¶¶ 93-98.)  The danger was created when the officers established the operational perimeter in the parking lot of the Murray Hills Apartment Complex.  (*Id*. ¶ 70.)  Mr. Villanueva picked up a sandwich from a restaurant to the east of the operational perimeter.  (*Id*. at ¶ 112.)  His apartment was on the west side of the operational perimeter.  (*Id*.)  The only way to his apartment was through the operational perimeter.  ECF No. 1-1.  *See also* Compl. ¶ 70.  On its own, Plaintiff plausibly alleges that the establishment of the operational perimeter enhanced the danger to a civilian such as Mr. Villanueva.  (Compl. ¶¶ 111-125.)  Even more, Plaintiff sufficiently pleads that Defendants' takedown while Mr. Villanueva was in the operational perimeter and kept their operational control there further placed him at immediate risk of harm.  (*Id.* ¶¶ 93-98.)  Officers White and Miyakusu acted affirmatively to place Mr. Villanueva in danger by ordering the arrest of Mr. Zetina while Mr. Villanueva was kept in their operational perimeter.  (*Id*. at ¶¶ 69-70.)

### iii.   *Plaintiff's Complaint Plausibly States Officers Abendschan, Watts, Criss, Boggs, Yanez, Reindollar, and Hunt Acted Affirmatively.*

Plaintiff sufficiently pleads that Officers Abendschan, Watts, Criss, Boggs, Yanez, Reindollar, and Hunt also acted affirmatively to cause Mr. Villanueva's injuries.  To be clear – it is ***not*** the failure to clear individuals from the operational perimeter that Plaintiff is alleging as an affirmative act in the Complaint.  Rather, it was the decision to arrest Mr. Zetina while Mr. Villanueva was kept in operational perimeter, blocking his path to safety and keeping him there.  This is evidenced in the Complaint where it is alleged that Officers Boggs, Criss, Watts, Yanez, and Abendschan each saw and observed Mr. Villanueva being kept within the operational

perimeter.  (Compl. ¶¶ 93-99.)  Officer Reindollar helped establish the perimeter.  *See* ECF No. 1-1.  Officer Hunt acted affirmatively in creating the BATTLE operation plan that the BATTLE Defendants utilized when apprehending Mr. Zetina.  (*Id*. ¶ 45.)  The affirmative act set forth in the Complaint is the units' decision to arrest Mr. Zetina while keeping Mr. Villanueva in the operational perimeter.  *Id*. at ¶ 165.

Defendants' Motion argues that the Complaint is "devoid of any well-plead allegations describing any specific action taken by any BATTLE Officer to "allow" and "keep" Plaintiff within the operational perimeter or "take control" over Plaintiff once inside the operational perimeter."  (Defs. Mtn to Dismiss, p. 13.)  Defendants rely upon *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989) to support their argument.  (*Id*., p. 8, fn 5.)  In *DeShaney*, social services recommended that Joshua be placed with his father even though the social services had been notified numerous times about alleged child abuse.  489 U.S. at 192.  The United States Supreme Court, in its seminal decision creating state-created danger, held: "while the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him more vulnerable to them."  *Id*. at 201.  Thus, an affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.  *Id*. at 200.

Unlike Joshua in *Deshaney,* Mr. Villanueva was not in danger at the Murray Hills Apartment complex **_until_** the operational perimeter was created and the takedown ensued.  (Compl. ¶¶ 61, 69-70.)  Also, unlike Joshua in *DeShaney*, who was perpetually in danger while in his father's care, Mr. Villanueva was limited by Defendants imposition on his freedom to act on his own behalf to keep himself safe.  (*Id*. at ¶¶ 92-100.)  Here, the BATTLE Defendants affirmatively

acted by keeping Mr. Villanueva within their operational perimeter without any knowledge, skills, or devices to protect himself, nor notice of the danger they were about to create.

The instant case is more factually similar to *Hernandez v. City of San Jose*, 897 F.3d 1125, 1133 (9th Cir. 2018) where the officers placed civilians "in a situation that was more dangerous than the one in which they found them."  In *Hernandez*, the officers allowed civilians to enter a dangerous area where they knew harm was likely to come.  *Id*. at 1130.  The *Hernandez* officers blocked the path to safety, directly causing the civilians to be injured.  *Id*. at 1134-35.  The *Hernandez* court reasoned that because the attendees alleged they would have "made it to safety" had the officers not affirmatively directed them into the crowd of protestors, they sufficiently pled there was an affirmative act.  *Id*. at 1135.  *See also Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000) (stating "[i]nstead, [the Court] examine[s] whether the officers left the person in a situation that was more dangerous than the one in which they found him.")  *S*ee also Kennedy*, 439 F.3d at 1064 n.5 (recognizing relevant inquiry is whether state action "le[ft] [the plaintiff] in a situation *more dangerous* than the one she already faced" (emphasis added)).

Like the officers in *Hernandez*, the BATTLE Defendants created an operational perimeter between where Mr. Villanueva was and where he needed to be.  (Compl. ¶¶ 93, 111-12.)  Mr. Villanueva was walking to his apartment complex from a restaurant across the street when he entered the operational perimeter.  (*Id*. ¶ 112.)  The BATTLE Defendants blocked his path to safety because the operational perimeter was directly in the path where Mr. Villanueva needed to travel.  (*Id*. ¶¶ 93, 111-12.)  Even more, the operational perimeter was neither marked nor secure.  (*Id*. ¶ 113.)  Mr. Villanueva did not know he was entering a dangerous area.  (*Id*. ¶¶ 69, 70, 113.)  By establishing an unsecured operational perimeter and allowing Mr. Villanueva to enter, the

BATTLE Defendants stripped his ability to defend himself.  *See Sanders,* 192 F. Supp. 2d at 1111.

(Citation omitted) (A state actor acts affirmatively when "they place an individual in a position of

danger, effectively stripping a person of his ability to defend himself….")

### 2.    Plaintiff Plausibly Alleges that the BATTLE Defendants' Actions Shock the Conscience.

The "conscience shocking" standard is high, requiring "a high level of outrageousness." [6]

*Estate of Reat*, 2013 WL 3010828, at *1 (citations omitted). Conscience-shocking behavior is most

likely to be found where there is an intent to do harm that is not justified by any government

interest.  *Id.*  (Citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)); *Cf. Uhlrig*, 64 F.3d

at 576 (where Defendants didn't meet the requisite level of intent because they did not intend to

injure plaintiff nor were they indifferent to the risk that would be created by their actions).

However, there may be some conduct that is egregious enough to state a substantive due process

claim where the conduct is ***more than negligent but less than intentional***.[7]  *Id.*  (emphasis added).

While courts give great deference to decisions made by police arising from emergency

situations, the standard is different where the officer has the chance to "truly deliberate."  *Radecki*

*v. Barela*, 146 F. 3d 1227, 1232 (10th Cir. 1998); *see also Cutter v. Metro Fugitive Squad*, No.

CIV-06-1158-GKF, 2008 WL 4068188, at *17-18 (W.D. Okla. Aug. 29, 2008) ("the key inquiry

is whether the official had the opportunity for deliberation").   Courts use the "deliberate

indifference" standard only when actual deliberation is practical.  *Sanders*, 192 F. Supp. 2d at 1113

---

[6] The Supreme Court "specifically admonished that a substantive due process violation requires more than an ordinary tort…." *Uhlrig*, 64 F.3d at 574 (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 128 (1992)).

[7] This is called the "middle range of the culpability spectrum." *Sanders* 192 F. Supp. 2d at 1113 (*citing Lewis*, 523 U.S. at 849-50). The opposite ends of the culpability spectrum are "tort liability at one end; conduct in which the state actor intended to cause harm and in which the state lacks any justifiable interest on the other.") *Id*. at 1114.

(citation omitted). Where the state actor has the luxury to truly deliberate about the decisions he or she is making, something less than unjustifiable intent to harm, such as calculated indifference, may suffice to shock the conscience. *Id.* (Citing *Radecki,* 146 F.3d at 1232).

In their Motion to Dismiss, Defendants argue that this case warrants an "emergency standard" analysis. (Defs. Mtn to Dismiss, pp. 13-14.) Ironically, Defendants improperly submitted evidence does not support their claims that this was an emergency. Quite the opposite, it clearly demonstrates that there was ***not an emergency*** because the BATTLE Defendants "were analyzing potential risks throughout the operation" and engaged in "thoughtful decision-making." (Defs. Mtn. to Dismiss, p. 35.) Moreover, Defendants' improperly submitted recording demonstrates that there was no emergency as the BATTLE Defendants had the opportunity to deliberate – indeed, they had hours to deliberate on how and when to arrest Mr. Zetina. *See* Compl. ¶¶ 49, 160; ECF No. 40-1, pp. 4-5; ECF No. 40-2 at 30:00-32:06.[8] Perhaps most importantly, the unit had time to deliberate the importance of civilian safety because they knew Mr. Villanueva was within their operational perimeter. (Compl. ¶¶ 93-101.) It follows that the unit was deliberately indifferent to Mr. Villanueva's safety and chose to arrest Mr. Zetina regardless of the risk their operation created to Mr. Villanueva. (*Id.*) Despite these concessions, Defendants hinge their entire argument on the premise that "the BATTLE Officers were thrust into a sudden and explosive law enforcement situation when Zetina drew a gun and fired at Flick and Stone as they attempted to arrest him." (Defs. Mtn. to Dismiss, p. 13.) It is disingenuous for the Defendants to

---

[8] The officers are clearly deliberating how and when to take down Mr. Zetina: "If he gets out of the car, and you think we can get to him before he gets back in the car, let me know;" "Trey says if we can get in there quick we can take him, looks like he may be pulling into [undiscernible];" "Okay, I'd rather set up when he comes out.;" "Can he see us if we come in from the east side?;" "Would it be better to come in from the … from Galley? I don't know now;" "Alright you call it, take him or not;" "Let's wait until Marcus and Steph are in the complex from Galley." ECF No. 40-2 at 30:00 – 32:06.

argue that the danger they themselves created also gives rise to the very same danger that exonerates them from constitutional responsibility. This shines the brightest of spotlights on the importance of the state-created danger doctrine and its applicability to the case at hand, particularly where the defendants are using dangers they create, to justify their decision-making and conduct. This state-created danger doctrine was meant to protect people like Mr. Villanueva, who was exposed to a danger created solely by the BATTLE Defendants' decision to arrest Mr. Zetina while Mr. Villanueva was in the operational perimeter under their operational control.

Plaintiff's Complaint sufficiently states there was no such sudden law enforcement situation. (Compl. ¶¶ 49, 157-60.) The BATTLE Defendants began tracking the stolen Saturn at approximately 8:00 a.m. (*Id*. ¶ 49.) Mr. Zetina was spotted by the BATTLE Defendants around noon and the takedown did not occur until after 3:30 p.m. (*Id*. ¶ 160.) Interestingly, the BATTLE Defendants had, and used, plenty of time in deciding whether to takedown Mr. Zetina. (*Id*. ¶¶ 49, 157-60.) Officer White staked out the Murray Hills Apartment Complex, observed Mr. Zetina, and reported back to his fellow officers. (*Id*. ¶¶ 71-78.) The officers deliberated about when to arrest Mr. Zetina safely, yet chose to arrest him when civilians were present and under their operational control inside the operational perimeter. (*Id*. ¶¶ 78, 95-101.)

Defendants cite to *Radecki,* 146 F.3d 1231, to persuade this Court that an emergency standard should be applied in this case. (Defs. Mtn. to Dismiss, pp. 10-11.) This argument is misplaced because in *Radecki* the officers were "confronted with a suddenly explosive law enforcement situation." 146 F.3d at 1232. However, in this case, there was no suddenly explosive law enforcement situation. (Compl. ¶¶ 49, 157-60). *See also* ECF No. 40-1, p. 35.; ECF No. 40-2 at 30:00-32:06.

The more appropriate test for the factual scenario pleaded in the Complaint is set forth in *Sanders,* 192 F. Supp. 2d at 1115.  In *Sanders,* the Court held that a deliberate indifference standard is proper where the Command Defendants had time to reflect and deliberate on their decisions.  *Id.* More specifically, the court reasoned that there was an ongoing emergency until 12:30, when the gunmen were found dead on school grounds.  *Id.*  The court then considered all time after 12:30 to be a period where the Defendants had the ability to reflect and deliberate because there was not an ongoing emergency—this included the time period where Mr. Sanders was injured and did not receive care, resulting in his death.  *Id.*  The court held that once the Command Defendants gained the ability to reflect and deliberate, they demonstrated a deliberate indifference towards [Mr.] Sanders' plight." *Id.*  Therefore, the court used a "deliberate indifference" standard opposed to an "emergency standard" for purposes of a shock the conscious analysis.  *Id.*

Plaintiff plausibly alleges that that the deliberate indifference standard is met because the BATTLE Defendants had time to reflect and deliberate on their decisions before they chose to take action.[9]  While deliberating, Defendants demonstrated a deliberate indifference toward the danger they created for Mr. Villanueva when they kept him within their operational perimeter and decided to arrest Mr. Zetina.  (Compl.  ¶¶ 95-99, 161.)  Indeed, the officers knew civilians would be in the operational perimeter.  (*Id.* ¶ 101.) The BATTLE Defendants had time to deliberate Mr. Villanueva's safety before ordering the takedown.  (*Id.* ¶¶ 49, 157-60.)  They also had time to deliberate Mr. Villanueva's safety before the start of the takedown.  (*Id.*)  Even though multiple officers knew that Mr. Villanueva was within the operational perimeter, the takedown was ordered

---

[9] The emergency did not occur until after Officers Flick and Stone attempted to "bear hug" Mr. Zetina.  (Compl. ¶¶ 103-106.)  That Mr. Villanueva was shot after the emergency began is immaterial – he was only exposed to the danger of being shot because the takedown was ordered and executed.  (*Id.* ¶¶ 78-80.)

and executed regardless of the risk it created to Mr. Villanueva.  (*Id*. ¶¶ 93-99.)  This constitutes deliberate indifference.  Accordingly, this Court should find that the Plaintiff sufficiently pled that BATTLE Defendants' actions shock the conscience.

More importantly, it does shock the conscious that any police agency would order the arrest of a dangerous non-threatening felon with civilians present.  It was dangerous enough for the unit to protect themselves with bullet-proof vests.  (*Id*. ¶ 102.)  The fact the unit protected themselves while creating the danger that caused Mr. Villanueva's injuries surely triggers the constitutional conclusion that the unit's decision is conscious shocking and was deliberately indifferent to Mr. Villanueva's safety.

### C.  PLAINTIFF PLAUSIBILY ALLEGES IN THE COMPLAINT THAT THE OFFICERS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

To demonstrate the BATTLE Defendants are not entitled to qualified immunity, the plaintiff must allege sufficient facts to show that – when taken as true – the defendant plausibly violated [plaintiff's] constitutional rights, which were clearly established at the time of the violation.  *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012) (citing *Robbins v. Oklahoma*, 519 F.2d 1242, 1249 (10th Cir. 2008)).  In this case, the BATTLE Defendants violated Mr. Villanueva's constitutional right to not be deprived of life liberty, or property without due process of law.  (Compl. ¶ 154.)  The test for qualified immunity may be addressed in any order.  *Estate of Reat*, 824 F.3d at 964.  Courts routinely analyze whether a constitutional right was clearly established prior to determining whether the defendant plausibly violated the plaintiff's constitutional rights. *See generally id*. ("Because there are cases where we can more readily decide the law was not clearly established before reaching the more difficult question of whether there has been a constitutional violation, we may exercise discretion in deciding which prong to address first.").

1.  **Plaintiff Plausibly Alleges in the Complaint that the Defendant Officers are Not Entitled to Qualified Immunity Because Plaintiff Has Sufficiently Pled a Cognizable Constitutional Violation.**

The BATTLE Officers are not entitled to qualified immunity because the facts alleged constitute a constitutional violation for the reasons set forth above. *See Schwartz*, 702 F.3d at 579; Section IV.B.1 and 2 *supra*.

2.  **Plaintiff Plausibly Alleges in the Complaint that the BATTLE Officers are Not Entitled to Qualified Immunity Because There Is Clearly Established Law Suggesting the BATTLE Officers Violated a Constitutional Right.**

For a constitutional right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Schwartz*, 702 F.3d at 588. The "very act in question" does not need to have been previously held unlawful for the constitutional right to be clearly established. *Id.* (Citation omitted). "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Waugh*, 617 F. App'x at 879 (citing *Shroff v. Spellman*, 604 F.3d 1179, 1190 (10th Cir. 2010)).

Defendants focus their argument on cases where qualified immunity was granted due to emergency circumstances. (Defs. Mtn. to Dismiss, pp. 17-20.) Defendants rely on *Radecki*, 146 F.3d 1227 (10th Cir. 1998) where the Tenth Circuit held that the officer was acting in response to an emergency and that the officer's conduct did not shock the conscience because he did not intend to harm the bystander." (Defs. Mtn. to Dismiss, p. 17.) Defendants also rely upon *Childress v. City of Arapaho*, 210 F.3d 1154 (10th Cir. 2000) as well as countless "high-speed pursuit" cases. (*Id.*, pp. 18-20.) Not only do these cases focus exclusively on emergency situations, but they are significantly factually different than the facts, taken as true, alleged in Plaintiff's Complaint. This is ironically conceded by Defendants in their improper exhibits to their Motion wherein they

concede: (1) There was in fact ***not*** an emergency because the BATTLE Defendants "were analyzing potential risks throughout the operation" and engaged in "thoughtful decision-making;" (2) Defendants' own recording demonstrates that there was no emergency as the BATTLE Defendants had the opportunity to deliberate – indeed, they had hours to deliberate on how and when to arrest Mr. Zetina; and (3) The reason Mr. Zetina was not arrested earlier was because the BATTLE Officers feared that Mr. Zetina would access his vehicle and start a chase that put the public at risk. *See* ECF No. 40-1, 34-35.; ECF No. 40-2 at 30:00-32:06. The only risk Mr. Zetina posed was created by the Defendants' decision to arrest him with Mr. Villanueva present.

However, for purposes of the qualified immunity analysis, it is noteworthy that in a non-emergency scenario, as pled in Plaintiff's Complaint, qualified immunity is denied. *Sanders,* 192 F. Supp. 2d 1094. For example, in the District of Colorado, the Court denied qualified immunity where police officers routinely denied life-saving assistance to a teacher shot during the Columbine attack. *Id.* In *Sanders*, the victim, Mr. Sanders, was shot twice while helping students evacuate Columbine High School. *Id*. at 1110. The Defendants affirmatively took steps to preclude care from getting to Mr. Sanders, even after the emergency had ceased. *Id*. at 1102. Mr. Sanders would have survived his gunshot wound had he been allowed treatment earlier. *Id*. at 1111-12. The *Sanders* court reasoned that the emergency occurred from approximately 11:15 a.m. to approximately 12:30 p.m., thereafter the officers had significant time to deliberate before allowing care to be given to Mr. Sanders at 4:00 p.m. *Id*. at 1114-15. As such, the Defendants in *Sanders* were not afforded the protection of qualified immunity because it was a non-emergency situation. *Id*. at 1123-24. In reaching this holding, the court opined ("[A]s of April 20, 1999, the "danger-creation" jurisprudence was clearly established in the Tenth Circuit and in sister circuits so that, in light of Plaintiff's well pleaded allegations, reasonable officers in the Command Defendants'

position would have understood that their actions violated Mr. Sanders constitutional right to substantive due process.")  A "precise factual correlation" is not required for officers to be put on notice that their actions violate constitutional rights.  *Id*. at 1122 (Citation omitted).

Plaintiff's Complaint sufficiently pleads a plausible claim that the BATTLE Officers are not entitled to qualified immunity.  In addition to the Defendants' own admissions set forth above, Plaintiff's Complaint sufficiently alleges that the BATTLE Defendants deliberated from 8:00 a.m., when Mr. Zetina was spotted with the stolen Saturn, until the shooting began around 3:30 p.m. (Compl. ¶¶ 49, 160.)  *See also* ECF No. 40-1, p. 3.  To be clear, the emergency did not begin until Mr. Zetina began shooting – after Officers Flick and Stone attempted to grab Mr. Zetina using a bear hug.  (Compl. ¶¶ 104-105.)  Just as the Defendants in *Sanders* had time to deliberate their actions after the emergency ended, the BATTLE Defendants had significant time to deliberate their actions before the emergency they themselves created.  *See Sanders*, 192 F. Supp. 2d at 1115. Here, as in *Sanders*, the victim suffered physical harm as a result of the affirmative acts of the police officers.  (Compl. ¶¶ 116-122, 124, 168.)  The BATTLE Defendants were, or should have been, aware that their actions gave rise to a Section 1983 claim, even in situations where the plaintiff is injured by a private citizen or third party.  (*Id*. ¶¶ 168-171.)  As such, Mr. Villanueva's constitutional right to not be deprived of life liberty, or property without due process of law was clearly established at the time of the takedown.  Accordingly, Defendants' request for qualified immunity should be denied.

### D.  PLAINTIFF PLAUSIBILY ALLEGES IN THE COMPLAINT THAT THE SECOND CLAIM STATES A CLAIM FOR FAILURE TO TRAIN.

#### 1.  Plaintiff has Sufficiently Pled a Failure to Train Claim Against the BATTLE Defendants.

To survive a motion to dismiss based on a claim where the plaintiff alleges that the municipality failed to train, the plaintiff must allege sufficient facts to show that – when taken as true – there is a direct causal connection between the failure to train and the alleged constitutional violation.  In *Monell*, 436 U.S. 658 (1978), the Supreme Court set forth the standard for a Section 1983 municipal liability claim.  The *Monell* Court held that a plaintiff may state a Section 1983 municipal liability claim when "the action that is alleged to be unconstitutional implements a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers" or is "visited pursuant to governmental 'custom' even though such custom has not received formal approval through the body's official decision-making channels." *Id.* at 690-91.

While the "failure to train" theory was first endorsed by the Supreme Court in *City of Canton v. Harris,* 489 U.S. 378, (1989), the test to establish municipal liability for "failure to train claims" was subsequentially set forth in *Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003). The *Carr* court held a plaintiff must demonstrate the following elements to establish a claim:

> (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situations with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference … toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Id.* (Citing *Brown v. Gray*, 227 F.3d 1278, 1286 (10th Cir. 2000); *Allen v. Muskogee*, 119 F.3d 837, 841–42 (10th Cir. 1997); *see also Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010); *Zartner v. City & Cty. of Denver, Colorado,* 242 F. Supp. 3d 1168, 1173–74 (D. Colo. 2017)).  For the reasons set forth below, Plaintiff sufficiently pled a failure to train claim upon which relief can be granted.

   **i.**  ***Plaintiff's Complaint Plausibly States that the Officers Exceeded Constitutional Limitations.***

For the reasons set forth above, Plaintiff has sufficiently pled that the BATTLE Defendants violated Mr. Villanueva's substantive due process under the state-created danger theory. *See Schwartz*, 702 F.3d at 579; Section IV.B.1 and 2 *supra*.

   **ii.**  ***Defendants Conceded that Plaintiff's Complaint Plausibly States the Use of Force Arose Under Circumstances that Constitute a Usual and Recurring Situation with which Police Officers Must Deal.***

 Defendants failed to address element No. 2 in their Motion to Dismiss.  Pursuant to Fed. R. Civ. P. 12(b)(6), it is the Defendants' burden to assert the defense that Plaintiff has failed to sufficiently plead that the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal.  By failing to do so in their opening brief, Defendants have waived the argument and conceded that this element was sufficiently pled by Plaintiff.  *Id*.; *See also Guttman v. Silverberg*, 167 F. App'x 1, 4 (10th Cir. 2005) (citing *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.d 979, 984 n.7 (10th Cir. 1994)).

   **iii.**  ***Plaintiff's Complaint Plausibly States the Inadequate Training Demonstrates a Deliberate Indifference.***

In *Canton,* 489 U.S. at 390, the Supreme Court explained the deliberate indifference element requires a plaintiff to show that "the need for more … training is so obvious, and the inadequacy so likely to result in the violation of the constitutional rights, that the policymakers of the [Defendants] can reasonably be said to have been deliberately indifferent to the need."  A showing of specific incidents which establish a pattern of constitutional violations is not necessary to put a municipality on notice that its training program is inadequate.  *Allen,* 119 F.3d at 841–47. Rather, evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious

potential for such a violation, is sufficient to trigger municipal liability. *Id*. (Citing *Canton,* 489 U.S. at 390 n. 10). *See also Bd. of Cnty. Comm'rs v. Brown,* 520 U.S. 397 (1997).  Training conducted "out of synch with the rest of the country in the police profession" and "plain foolishness" can constitute enough deliberate indifference to survive summary judgment. *See Allen*, 119 F.3d at 844.

"The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Carr*, 337 F.3d at 1229.  Although "[i]n most instances, notice can be established by proving the existence of a pattern of tortious conduct," in a "narrow range of circumstances, ... deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction." *Id.*  An example of such a narrow instance is "when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations." *Id.*  Under these circumstances, even where a municipality's "policy is not unconstitutional, a single incident of excessive force can establish the existence of an inadequate training program if there is some other evidence of the program's inadequacy." *Id.*  (Citing *Brown v. Gray*, 227 F3d 1278, 1286 (10th Cir. 2000).

Defendants rely upon *Rodriguez v. Chavez*, 12-cv-01071-PAB-MJW, 2014 WL 4627274, at *5 (D. Colo. Sept. 16, 2014), to suggest that Plaintiff has not sufficiently pled "deliberate indifference."  (Defs. Mtn. to Dismiss, p. 28.)  However, this reliance is misplaced.  In *Rodriguez*, the Court fails to analyze the plaintiff's deliberate indifference element, as it concluded her causation allegations were insufficient.  *Id*. at * 5.  Moreover, unlike the instant case, the Plaintiff

in *Rodriguez* attempted to rely upon numerous complaints to establish the existence of "deliberate indifference," but failed to provide any supporting facts to suggest that the complaints should have been substantiated – that the total number of complaints supported the conclusion that Denver or the police chief knew or should have known that a constitutional violation was "substantially certain to result" in her case.[10]  However, this is simply not the standard where a single incident can establish the existence of an inadequate training program.  *Carr*, 337 F.3d at 1229.

A plaintiff need not prove "the existence of a pervasive problem [, nor] ... that the chief of police was personally aware of and chose to ignore the problem.  *Brown*, 227 F.3d at 1289. Instead, the plaintiff must establish that the policymaker was "deliberately indifferent to the risks posed by the inadequate training." *Id.*

In  *Allen*, the Court overturned summary judgment in favor of the city as to the plaintiff's claim that there was insufficient evidence in the record of inadequate training to deal with armed suicidal and mentally ill individuals. *Allen*, 119 F.3d at 842.  There was deposition testimony by the Plaintiff's expert that the officers acted contrary to accepted police practices by, within the span of 90 seconds, arriving on the scene, aggressively approaching a suicidal man with a gun, physically trying to take his gun away, and then shooting him when he pointed the gun at one of the officers. *Id.* at 839, 842-43.  There was also evidence that the city knew that encounters with armed individuals and mentally ill individuals were common for its officers, and, moreover, there was testimony by the city personnel that the officers acted in accordance with their training. *Id.* at 842-42. The *Allen* court reasoned:

> "The likelihood that officers will frequently have to deal with armed emotionally upset persons, and the predictability that officers trained to leave cover, approach,

---

[10] Notably, this case was distinguished by *Zartner*, 242 F. Supp. 3d 1168 wherein this Court held that the deliberate indifference element *was met* were the city was on notice of complaints about the city's officer.

> and attempt to disarm such persons will provoke a violent response, could justify a finding that the City's failure to properly train its officers reflected deliberate indifference to the obvious consequence of the City's choice. The likelihood of a violent response to this type of police action also may support an inference of causation—that the City's indifference led directly to the very consequence that was so predictable."

*Id*. at 845.

As a result, the Court concluded that summary judgment was inappropriate on the plaintiff's insufficient training claim against the city. *Id.*

Similarly, in *Brown*, the Tenth Circuit upheld another jury verdict for the plaintiff on his insufficient training claim against the city where the officer shot the plaintiff while the officer was attempting to effectuate an off-duty arrest. *Brown*, 227 F.3d at 1291. More specifically, the Tenth Circuit found that where the chief of police (whom the parties both treated as a policymaker) testified that "a conscious decision was made" regarding a training program, acknowledged the risk of the policy at issue, and "insisted that no further training was necessary" to implement the policy, the plaintiff had provided sufficient evidence for the jury to find that the City "was deliberately indifferent to the risks posed by the inadequate training." *Brown*, 227 F.3d at 1289. The *Brown* court opined:

> "Expert testimony established that always armed/always on duty policies present serious safety risks, to officers and to the public, if officers are not trained in off-shift implementation. Captain O'Neill knew to a moral certainty that the policy would result in some officers taking police action while off-shift, yet he pursued a training program that did not adequately prepare the officers to do so. The failure to train officers in implementing this policy was, by Captain O'Neill's own admission, a conscious decision based on the perception that on-and-off-shift situations were the same. The jury was thus presented with sufficient information to conclude that Denver policymakers were aware of and deliberately indifferent to the risks presented by the training program's deficiencies. Where, as here, the evidence supports a reasonable inference favorable to the jury verdict, the fact that a contrary inference may be drawn does not mandate the entry of judgment as a matter of law."

*Id*. at 1290.

The Plaintiff has sufficiently pled deliberate indifference in this case.  More specifically, Plaintiff plausibly alleges that that the deliberate indifference standard is met because the BATTLE Defendants had time to reflect and deliberate on their decisions before they chose to act.  While deliberating, Defendants demonstrated a deliberate indifference toward the danger they created for Mr. Villanueva when they kept him within their operational perimeter and decided to arrest Mr. Zetina.  (Compl. ¶¶ 95-99, 161.)  Indeed, the officers knew civilians would be in the operational perimeter.  (*Id*. ¶ 101.)  The BATTLE Defendants had time to deliberate Mr. Villanueva's safety before ordering the takedown. (*Id*. ¶¶ 49, 157-60.)  They also had time to deliberate Mr. Villanueva's safety before the start of the takedown.  (*Id*.)  Even though multiple officers knew that Mr. Villanueva was within the operational perimeter, the takedown was ordered and executed regardless of the risk it created to Mr. Villanueva.  (*Id*. ¶¶ 93-99.)  This constitutes deliberate indifference.  Thus, the need to train BATTLE Defendants can be said to be so obvious that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights. *Canton,* 489 U.S. at 390, n.10.  (Citation omitted).

       **iv.**    **Plaintiff's Complaint Plausibly States there is a Direct Causal Link Between the Constitutional Deprivation and the Inadequate Training.**

In *Monell*, the Supreme Court held that a municipality cannot be liable under Section 1983 on a *respondeat superior* theory for merely employing a tortfeasor.  *See id.* at 691.; *see also Starrett v. Wadley,* 876 F.2d 808, 818 (10th Cir.1989).  Rather, municipalities are subject to liability only for their official policies or customs: "[I]t is when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983." *Monell,* 436 U.S. at 694.  Therefore, for liability to attach in a failure to train case, "'the identified deficiency in a city's training program must be closely related to the ultimate injury,' it

'actually caused' the constitutional violation." *Id.* (Internal citations omitted).  "A plaintiff must cite a specific deficiency in the city's training that was so closely related to his injury it can fairly be considered the moving force behind his injury."  *Estate of Valverde v. Dodge*, No. 16-cv-1703-MSK-MEH, 2017 WL 3530282, at *5 (D. Colo. Aug. 17, 2017).

Defendants argue that the "moving force" in this case was Zetina, not the BATTLE Defendants.  (Defs. Mtn. to Dismiss, p. 23.)  That is simply not the case nor is it analogous to the Columbine case as Defendants suggest.  The officers in the Columbine case responded to an *ongoing emergency*, but the Defendants here ***created*** the emergency.  The BATTLE unit was improperly trained, if they were trained at all, in several respects.  First, Plaintiff alleges the BATTLE unit was not properly trained to safeguard innocents kept within operational perimeters created to arrest dangerous, non-threatening felons.  (Compl. ¶¶ 135-152; 175-178.)  Second, Plaintiff alleges the BATTLE unit was not properly trained to refrain from giving go orders to arrest dangerous, non-threatening felons with civilians present in the operational perimeter.  (*Id.*)  Finally, Plaintiff alleges the BATTLE unit was not properly trained on how to apprehend and arrest dangerous, non-threatening felons while civilians are within the operational perimeter.  (*Id.*).

Instead of focusing on the sufficiency of the allegations in the Complaint, the Defendants are asking this Court to make a factual determination regarding fault while simultaneously arguing Plaintiff is not entitled to discovery on that very determination.  The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *Dubbs,* 336 F.3d at 1201.  As such, this argument fails as a matter of law.

Also, Defendants contend that CSP's failure to train was the moving force opposed to the County and City.  Again, Defendants are requesting that this Court make an improper factual

determination as opposed to looking to the legal sufficiency of the Complaint to state a claim for which relief may be granted.  Regardless, separate and apart from any training from the CSP, both the County and City have their own training policies which could have led to the constitutional violations alleged.  Nothing more is required to survive Defendants' Motion to Dismiss.

        v.        *Plaintiff Concedes Section 5 Defendants' Motion.*

       vi.       *Plaintiff Concedes Section 5 Defendants' Motion.*

## V.   CONCLUSION

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order denying Defendants' Joint Motion to Dismiss, ECF No. 40.

Respectfully Submitted this 20th day of May 2019.

                            */s/ Colleen T. Calandra*
                            Colleen T. Calandra, Esq.
                            */s/ Rebekah Stern*
                            Rebekah Stern, Esq.
                            */s/ Joseph Ramos*
                            Joseph Ramos, Esq., M.D.
                            */s/ Brian Calandra*
                            Brian Calandra, Esq.
                            Ramos Law
                            3000 Youngfield Street
                            Wheat Ridge, CO 80215
                            Phone Number: (303) 733-6353
                            Fax Number:   (303)865-5666
                            Email: joe@ramoslaw.com
                                    brian@ramoslaw.com
                                    colleen@ramoslaw.com
                                    rebekah@ramoslaw.com

                            */s/ Scott Hooper*
                            Scott Hooper, Esq.
                            2929 Allen Parkway, 39th Floor
                            Houston, TX 77019
                            Phone Number: (713) 529-5055
                            Email: shooper@shooperlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

**Nathan J. Whtiney**
**Raymond M. Deeny**
**Sherman & Howard L.L.C.**
90 S. Cascade Avenue, Suite 1500
Colorado Springs, CO 80903
rdeeny@shermanhoward.com
nwhitney@shermanhoward.com

*Attorneys for Defendants El Paso County,*
*Bill Elder, El Paso County Sheriff, and*
*Jacob Abendschan, Sergeant, El Paso*
*County Sheriff's Office*

**Gordon L. Vaughan, Esq.**
**Ann B. Smith, Esq.**
**VAUGHAN & DEMURO-COLORADO SPRINGS**
111 South Tejon Street, Suite 545
Colorado Springs, CO 80903
gvaughan@vaughandemuro.com
asmith@vaughandemuro.com

*Attorneys for Scott Stone, John Watts,*
*Stephanie Criss & Michael Boggs*

**William Thomas O'Connell, III**
**WELLS ANDERSON & RACE, LLC**
1700 Broadway, Suite 1020
Denver, CO 80290-1001
woconnell@warllc.com

*Attorney for Tremaine White*

**Anne H. Turner**
**Assistant City Attorney**
**OFFICE OF THE CITY ATTORNEY OF**
**COLORADO SPRINGS, CO**
30 S. Nevada Ave., Suite 501
Colorado Springs, Colorado 80903
aturner@springsgov.com

*Attorney for City of Colorado Springs, Peter Carey, Kevin Miyakusu, and Marcus Yanez*

**William V. Allen**
**Kimberly Sorrells**
**Colorado State Attorney General's Office**
**Ralph L. Carr Judicial Building**
1300 Broadway, 7th Floor
Denver, CO 80203
Kimberly.sorrells@coag.gov
will.allen@coag.gov

*Attorneys for John Reindollar and Chad Hunt*

**Virginia Frazer-Abel**
**Frazer-Abel Law, LLC**
4704 Harlan St., Ste. 250
Denver, CO 80212
virginia@vfalegal.com

*Special Administrator for Estate of Micah Flick*

*/s/ Rhys Lockard*
Rhys Lockard, Paralegal