IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 19-cv-00295-PAB-KMT

THOMAS VILLANUEVA,

     Plaintiff,

v.

EL PASO COUNTY,
BILL ELDER, Sheriff, El Paso County Sheriff's Office, in his official capacity;
THE ESTATE OF MICAH FLICK, Deputy, El Paso County Sheriff's Office, in his
individual capacity;
SCOTT STONE, Deputy, El Paso County Sheriff's Office, in his individual capacity;
JACOB ABENDSCHAN, Sergeant, El Paso County Sheriff's Office, in his official and
individual capacities;
JOHN WATTS, Detective, El Paso County Sheriff's Office, in his individual capacity;
TREMAINE WHITE, Detective, El Paso County Sheriff's Office, in his individual
capacity;
STEPHANIE CRISS, Detective, El Paso County Sheriff's Office, in her individual
capacity;
MICHAEL BOGGS, Detective, El Paso County Sheriff's Office, in his individual
capacity;
THE CITY OF COLORADO SPRINGS, COLORADO;
PETER CAREY, Chief of Police, Colorado Springs Police Department, in his official
capacity;
KEVIN MIYAKUSU, Sergeant, Colorado Springs Police Department, in his official and
individual capacities;
MARCUS YANEZ, Officer, Colorado Springs Police Department, in his individual
capacity;
JOHN REINDOLLAR, Investigator, Colorado State Patrol, in his individual capacity;
and
CHAD HUNT, Sergeant, Colorado State Patrol, in his individual capacity,

     Defendants.

---

**ORDER**

---

This matter is before the Court on Defendants' Joint Motion to Dismiss [Docket

No. 40].  The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I.  BACKGROUND[1]

Defendants sued in their individual capacity are law enforcement officers who were involved in an attempt to arrest a suspected car thief.  Docket No. 1 at 2-4.  When the officers attempted to subdue the suspect, the suspect shot three of the officers, killing one.  *Id.* at 3.  A stray bullet fired by the suspect struck plaintiff, an innocent pedestrian, paralyzing him from the chest down.  *Id.* at 18-19, ¶¶ 116-118.

The above-referenced officers were part of "Beat Auto Theft Through Law Enforcement" ("BATTLE") team, composed of agents from the Colorado Springs Police Department, El Paso County Sheriff's Office, and the Colorado State Patrol (CSP).  *Id.* at 7, ¶ 19.  The BATTLE team's goal is to "look for and attempt to recover stolen vehicles."  *Id.*  Team members dress in plain clothes and drive undercover vehicles.  *Id.*, ¶¶ 19-20.  Although a multi-jurisdictional operation, CSP is the lead agency.  *Id.*, ¶ 22.  CSP thus has "field supervisory responsibility . . . and must ensure that BATTLE Operational Guidelines are followed."  *Id.*, ¶ 25.

During the February 5, 2018 operation in question, the BATTLE team had eleven members, *id.* at 9-10, ¶ 44, dressed in plain clothes, with a police badge underneath their clothing.  *Id.* at 10, ¶ 46.  The team rode in four unmarked police vehicles.  *Id.*, ¶ 47.  The members of one vehicle located a stolen green 1999 Saturn and placed a tracking device on it.  *Id.*, ¶ 49.  Eventually, the tracking device showed

---

[1] The Court assumes that the allegations in plaintiff's complaint are true in considering the motion to dismiss.  *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011).

that the Saturn had begun to move, and the BATTLE team tracked it to a car wash where they observed the suspect, Manuel Zetina, spray painting the Saturn blue. *Id.* at 11, ¶¶ 52-53. One team member saw that Mr. Zetina was wearing a hooded sweatshirt with the number "13" on it, a number associated with the Mexican Mafia. *Id.*, ¶ 55.

Mr. Zetina then left the car wash. *Id.* at 12, ¶ 59. Mr. Zetina conducted several driving maneuvers, called "burn" moves, to determine whether law enforcement was following him. *Id.*, ¶ 60. The BATTLE team tracked Mr. Zetina to an apartment complex where they observed Mr. Zetina finish painting the Saturn. *Id.*, ¶¶ 61-62. Mr. Zetina drove away, again conducting burn moves, before ending up at a different apartment complex. *Id.* at 12-13, ¶¶ 64, 66. The BATTLE team chose not to arrest Mr. Zetina because he was near his vehicle. *Id.* at 13, ¶ 67. Mr. Zetina ended up at the Murray Hill Apartments in Colorado Springs. *Id.*, ¶ 68; *see also id.* at 3 n.2.

The BATTLE team set up an "operational perimeter" around the Murray Hill Apartments, with each team vehicle parked "in a different spot at the apartment complex." *Id.*, ¶ 69. A team member saw Mr. Zetina smoking what was believed, and later confirmed, to be methamphetamine. *Id.* at 14, ¶¶ 74-75. When Mr. Zetina walked into the apartment building, the BATTLE team determined that it was a "good time to takedown Mr. Zetina because he was alone and away from the Saturn." *Id.*, ¶¶ 75, 78.

Mr. Zetina walked out of the apartment with his right hand in his jacket pocket and elbow flexed. *Id.* at 15, ¶ 84. Team member Tremaine White thought Mr. Zetina was concealing a weapon. *Id.*, ¶ 85. He told other team members that Mr. Zetina had a weapon in his hand. *Id.*, ¶ 88. Although BATTLE team members were dressed in

plain clothes, Mr. Zetina seemed to be aware that several members were law enforcement.  *Id.*, ¶¶ 87, 89.  Mr. Zetina moved his arms as he approached two BATTLE team members, appearing to be drawing his weapon.  *Id.* at 16, ¶ 90. Deputies Scott Stone and Micah Flick grabbed Mr. Zetina in a "bear hug" to prevent him from using his arms.  *Id.* at 17, ¶¶ 102, 104.

The bear hug was unsuccessful, and Mr. Zetina pulled out a gun, shot Deputy Stone in the hip, shot and killed Deputy Flick, and shot Officer Marcus Yanez.  *Id.* at 17-18, ¶¶ 105-107, 109.   Mr. Zetina continued to shoot his gun.  *Id.* at 18, ¶ 110. Team members then shot Mr. Zetina, who died from his injuries.  *Id.*

Plaintiff lived in the Murray Hill Apartments.  *Id.*, ¶ 111.  Moments before the gunfight began, plaintiff walked through the Murray Hill Apartments' parking lot carrying sandwiches he had purchased across the street.  *Id.* at 16, 18, ¶¶ 92, 118.  Several BATTLE team members saw plaintiff within the operational perimeter of the attempted arrest.  *Id.* at 16-17, ¶¶ 95-99.  A stray bullet fired by Mr. Zetina hit plaintiff in the spine, causing spinal cord damage and paralysis.  *Id.* at 18-19, ¶¶ 116, 118-122.

On February 1, 2019, plaintiff filed this law suit against the BATTLE team members, the City of Colorado Springs, and El Paso County.  *See* Docket No. 1. Plaintiff alleges that defendants violated his rights to life, liberty, and personal security under the Fourteenth Amendment under the theory of state-created danger.  *Id.* at 23. Plaintiff also alleges the same constitutional violations under the theory of failure to train against the El Paso County Sheriff's Office, El Paso County Sheriff Bill Elder, Sergeant Jacob Abendschan of the El Paso County Sheriff's Office, the Colorado

Springs Police Department, Colorado Springs Chief of Police Peter Carey, and

Sergeant Kevin Miyakusu of the Colorado Springs Police Department. *Id.* at 26-27, ¶

173.[2]

Defendants filed a joint motion to dismiss under Rule 12(b)(6). *See* Docket No.

40. As to plaintiff's first claim, defendants principally argue (1) that there was no

affirmative act as required under a theory of state-created danger and (2), even if there

were an affirmative act, defendants' actions do not shock the conscience. *Id.* at 9-10.

Alternatively, defendants assert that they are entitled to qualified immunity on the first

claim. *Id.* at 14. The second claim, defendants contend, must be dismissed because

either (1) Mr. Zetina was the moving force behind plaintiff's injuries or (2) plaintiff has

not alleged that defendants were deliberately indifferent to plaintiff's well-being. *Id.* at

23-29.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, a complaint must allege enough factual matter that, taken as true, makes

the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671

F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). "The 'plausibility' standard requires that relief must plausibly follow from the

facts alleged, not that the facts themselves be plausible." *RE/MAX, LLC v. Quicken*

*Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534

F.3d 1282, 1286 (10th Cir. 2008)). Generally, "[s]pecific facts are not necessary; the

---

[2] Plaintiff dismissed his third and fourth claims. *See* Docket No. 45 at 2.

statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted).  However, a plaintiff still must provide "supporting factual averments" with his allegations.  *Cory v. Allstate Insurance*, 584 F.3d 1240, 1244 (10th Cir. 2009) ("[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." (citation omitted)).  Otherwise, the Court need not accept conclusory allegations.  *Moffet v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson*, 534 F.3d at 1286 (alterations omitted).

## III.  ANALYSIS

### A.  State-Created Danger

6

Plaintiff asserts a claim under the Due Process Clause of the Fourteenth Amendment, which states that a state cannot "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.  The Due Process Clause does not typically impose a duty to protect against private violence.  *DeShaney v. Winnebago Cty. Dep't of Social Servs.*, 489 U.S. 189, 197 (1989).  "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf – through incarceration, institutionalization, or other similar restraints of personal liberty – which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests in harms inflicted by other means."  *Id.* at 200.  The Tenth Circuit has recognized two exceptions to this general rule: (1) "when the state has assumed a special relationship with and control over an individual" and (2) "where [a state] official[] created the very danger that caused the harm.'"  *Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1173 (10th Cir. 2013) (citations omitted).

There are two preconditions to asserting a state-created danger claim: (1) the state actor must make an affirmative act and (2) the injury must result from private violence.  *Id.* (citing *Gray v. Univ. Colo. Hosp. Auth.*, 672 F.3d 909, 920 n.8 (10th Cir. 2010).  Once that showing has been made, a plaintiff must satisfy a six-part test:

> (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

*Christiansen v. City of Tulsa*, 332 F.3d 1270, 1281 (10th Cir. 2003) (citation omitted).

Plaintiff has met the second precondition, that the injury resulted from private violence. *See* Docket No. 1 at 18, ¶ 116; *Gillen*, 710 F.3d at 1173 (citation omitted). Plaintiff has not, however, plausibly alleged an affirmative act on the part of defendants that satisfies the requirements for state-created danger. Additionally, even if the Court were to determine that defendants' actions did constitute affirmative acts, they would not shock the conscience. Lastly, a finding that defendants' actions shock the conscience would still not place liability on defendants, as defendants are entitled to qualified immunity.

*1. Affirmative Action*

Plaintiff alleges three categories of affirmative acts. First, that certain team members created the operational perimeter and initiated the take down. Docket No. 46 at 8. Second, that various team members "allowed" and "kept" plaintiff within the operational perimeter. *Id.* Third, that Deputies Flick and Stone grabbed Mr. Zetina. *Id.*

As to the operational perimeter and the takedown, plaintiff alleges that the operational perimeter was located in the parking lot of the Murray Hill Apartments and that the BATTLE team "did not clear civilians from the operational perimeter or secure the operational perimeter at any point." Docket No. 1 at 13, ¶ 70. Deputy White observed Mr. Zetina "smoking a pen" and the team believed Mr. Zetina was smoking some illicit substance. *Id.* at 14, ¶ 73. After Mr. Zetina left his vehicle and entered the apartment complex, Deputy White "told the team it was a good time to takedown Mr. Zetina." *Id.*, ¶¶ 76, 78. Sergeant Miyakusu gave the "go-ahead" and Deputy Boggs

also stated that the BATTLE team "should attempt a takedown of Mr. Zetina." *Id.*, ¶ 79.

When Mr. Zetina left the apartment building, his right hand was in his jacket pocket with

his elbow flexed, which Deputy White believed meant that Mr. Zetina was carrying a

weapon and communicated as such to the BATTLE team. *Id.* at 15, ¶¶ 85, 88. Mr.

Zetina was "staring intently at Deputies Flick and Stone, who were walking towards Mr.

Zetina." *Id.*, ¶ 89. Deputy White believed that Mr. Zetina was aware that the BATTLE

team was law enforcement. *Id.*, ¶ 87. Deputies Flick and Stone attempted to use a

"bear hug" on Mr. Zetina to prevent Mr. Zetina from firing his gun, which started the

shooting. *Id.* at 17, ¶¶ 102-106.

As to the BATTLE team's actions in regards to plaintiff, plaintiff alleges the

following. Plaintiff entered the Murray Hill Apartments parking lot and followed multiple

team members. *Id.* at 16, ¶¶ 92-93. The BATTLE team "kept [plaintiff] in the

operational perimeter, and allowed him to continue walking towards Mr. Zetina." *Id.*,

¶ 93. Detective Michael Boggs saw plaintiff walk into the operational perimeter,

allowed plaintiff to continue walking, and "kept [plaintiff] in the operational perimeter."

*Id.*, ¶ 95. Detective Stephanie Criss "allowed" plaintiff to walk towards the takedown

and "kept [plaintiff] in the operational perimeter." *Id.*, ¶ 96. Detective John Watts saw

plaintiff walking in the operational perimeter and "kept [plaintiff] in the operational

perimeter." *Id.*, ¶ 97. Officer Yanez saw plaintiff walking in the operational perimeter

and "kept [plaintiff] in the operational perimeter." *Id.* at 17, ¶ 98. Sergeant Abendschan

saw plaintiff walking in the operational perimeter, "allowed" him to walk towards the

takedown, and did not stop plaintiff. *Id.*, ¶ 99.

First, the Court finds that plaintiff's allegations as to defendants keeping plaintiff within the operational perimeter are conclusory.  Plaintiff has proffered no facts as to how defendants "kept" plaintiff within the operational perimeter.  Plaintiff does not allege that any team members ordered him to stay within the perimeter, that there were blockades preventing him from leaving the perimeter, or that the BATTLE team took any actions to ensure that he stayed within the perimeter.  Indeed, plaintiff alleges that the BATTLE team "did not . . . secure the operational perimeter at any point," which contradicts his allegation that the BATTLE team kept him within the perimeter.  Docket No. 1 at 13, ¶ 70.  In other words, plaintiff has not provided any "supporting factual averments" with his allegations; he has merely stated that several team members "kept" him in the perimeter.  *See Cory*, 584 F.3d at 1244.  The Court need not accept conclusory allegations.  *Moffet*, 291 F.3d at 1232.

Second, the allegation that defendants allowed plaintiff into the operational perimeter does not constitute "the requisite affirmative conduct necessary to state a viable [42 U.S.C.] § 1983 claim."  *Ruiz v. McDonnell*, 299 F.3d 1173, 1183 (10th Cir. 2002).  Defendants' decision to let plaintiff walk through the perimeter – even after seeing him – is better characterized as a failure to *prevent* plaintiff from entering the operational perimeter.  In other words, allowing plaintiff into the perimeter is inaction, not affirmative action.  But inaction is not redressable under § 1983.  *See DeShaney*, 489 U.S. at 197.  Moreover, even if defendants' decision to "allow" plaintiff into the perimeter could be characterized as affirmative in a general sense, it still would not be the type of affirmative act that the state-created danger doctrine scrutinizes.

For example, in *Ruiz*, the Tenth Circuit found that licensing a day care did not constitute an affirmative act.  299 F.3d at 1183.  There, a private day care was licensed to receive federal funding even though the operators of the day care had an "extensive history of domestic violence."  *Id.* at 1178.  The plaintiff's child was shaken to death while attending the day care.  *Id.*  The *Ruiz* court held that the "improper licensure did not impose an immediate threat of harm."  *Id.* at 1183.  And, moreover, the licensure "affected the public at large; it was not aimed" at the plaintiff or her child.  *Id.*

In another case, the Tenth Circuit held that "untruthful assurances" to a decedent and his family were not affirmative acts under the state-created danger doctrine.  *Gray*, 672 F.3d at 925.  In *Gray*, defendant hospital workers assured plaintiff that the decedent would be monitored at all times while under seizure surveillance.  *Id.* at 912.  Defendants did not monitor the plaintiff, who suffered a seizure and died.  *Id.* Nonetheless, the Tenth Circuit held that the "state actors were aware of the risk, expressly promised to eliminate the risk, and failed to do so, with no constitutional implications."  *Id.* at 925.

Defendants' actions here do not constitute affirmative acts under the state-created danger doctrine.  Like *Ruiz*, where the licensure itself did not lead to an immediate threat of harm, defendants' decision to allow plaintiff into the operational perimeter did "not impose an immediate threat of harm."  299 F.3d at 1183.  Defendants cannot be said to have placed plaintiff in immediate threat of harm by simply positioning themselves in a parking lot and allowing plaintiff to walk through it.  Even if entering the perimeter did place plaintiff in immediate threat of harm, the establishment of the

perimeter was directed at the apprehension of Mr. Zetina, not at plaintiff specifically. *Ruiz*, 299 F.3d at 1183.  The crux of the matter here, as in *Ruiz*, is that the conduct was not directed at plaintiff; any civilian was allowed into the perimeter.  *Id.*  The failure to remove plaintiff or prevent him from entering has "no constitutional implications."  *Gray*, 672 F.3d at 925.[3]

Finally, the decision to initiate the takedown and the bear hug, even if they put plaintiff in immediate threat of harm, were not directed at plaintiff any more than the licensure in *Ruiz* was directed at the plaintiff in that case.  *See* 299 F.3d at 1183.  The danger of these actions was borne by all civilians in the area.[4]

Therefore, the Court concludes that defendants did not take any affirmative action that would subject them to liability under the state-created danger doctrine.

*2. Shock the Conscience*

Assuming that defendants' actions could be considered affirmative actions,

---

[3] The fact that defendants knew that Mr. Zetina was a gang member and under the influence of narcotics does not change this analysis.  Like in *Gray*, defendants may have been "aware of the risk" and "failed" to eliminate that risk, but that does not turn their actions into cognizable affirmative acts.  *Id.*; *see also Deshaney*, 489 U.S. at 201 ("While the State may have been aware of the dangers . . . it played no part in their creation.").

[4] Plaintiff's reliance on *Hernandez v. City of San Jose*, 897 F.3d 1125 (9th Cir. 2018), and *Kingsmill v. Szewcak*, 117 F. Supp. 3d 657 (E.D. Pa. 2015), is misplaced. In *Hernandez*, the defendants blocked alternative exits from a convention center and "affirmatively directed" the plaintiffs into an angry group of protesters.  897 F.3d at 1129, 1135.  Here, defendants neither directed plaintiff to enter the operational perimeter nor prevented plaintiff from leaving (other than plaintiff's conclusory allegations that defendants "kept" plaintiff in the perimeter).  In *Kingsmill*, a police officer verbally ordered the plaintiff away from a physical altercation, forcing the plaintiff to turn his back to his assailant.  117 F. Supp. 3d at 666-67.  Defendants here did not give any verbal instructions to plaintiff that placed him in danger, but merely noticed that he was in the operational perimeter.

those actions would still not shock the judicial conscience.  In assessing whether state action shocks the conscience, the Court must keep in mind "(1) the need for restraint in defining [its] scope, (2) the concern that § 1983 not replace state tort law, and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety." *Radecki v. Barela*, 146 F.3d 1227, 1230 (10th Cir. 1998) (quoting *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995)).  "Only government conduct that 'shocks the conscience' can give rise to a substantive due process claim." *Perez v. Unified Gov't*, 432 F.3d 1163, 1166 (10th Cir. 2005) (citation omitted).

Negligent behavior by state officials "is categorically beneath the threshold of constitutional due process." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).  Thus, the Court looks to "the nature of the official conduct on the spectrum of culpability that has tort liability at one end." *Radecki*, 146 F.3d at 1232.  On the opposite side of that spectrum is behavior "in which [a] government official intended to cause harm and in which the state lacks any justifiable interest." *Id.*  "In emergency situations, only conduct that reaches that far point will shock the conscience and result in constitutional liability." *Id.*  But, "where the state actor has the luxury to truly deliberate about the decisions he or she is making, something less than unjustifiable intent to harm, such as calculated indifference, may suffice to shock the conscience." *Id.*  Thus, in an emergency situation, only an intent to harm will shock the conscience. *Id.*  In situations where an officer has time to truly deliberate, calculated or deliberate indifference will shock the conscience. *Id.*; *see also Perez*, 432 F.3d at 1166 ("[W]hen a government official has enough time to engage in 'actual deliberation,' conduct that shows

'deliberate indifference' . . . will shock the conscience." (citation omitted)).

To truly deliberate means "more than having a few seconds to think." *Perez*, 432 F.3d at 1167.  Thus, "the intent to harm standard is not limited to situations calling for split-second reactions." *Id.*  Intent to harm will apply "whenever decisions must be made in haste, under pressure, and frequently without the luxury of a second chance." *Id.* (citation and quotations omitted).  "The intent-to-harm standard most clearly applies in rapidly evolving, fluid, and dangerous situations which preclude the luxury of calm and reflective deliberation."  *Id.* (citation and quotations omitted).

While the BATTLE team might have made the decision to initiate tracking Mr. Zetina with time to deliberate, the decision to initiate arrest was not made with the luxury of time.  Plaintiff argues that, because the BATTLE team began tracking Mr. Zetina at 8:00 a.m., they had time to deliberate.  Docket No. 46 at 18.  According to plaintiff, that the team did not initiate a takedown at the previous two apartment complexes also demonstrates that they had sufficient time to deliberate.  *Id.*  However, the opposite is true.  The BATTLE team had to make a decision at each location, "in haste . . . without the luxury of a second chance," and decide the best moment to arrest Mr. Zetina.  *Perez*, 432 F.3d at 1167.  Plaintiff implicitly acknowledges that the BATTLE team had a limited window to arrest Mr. Zetina, as Mr. Zetina could not be near his vehicle or he would risk escaping.  Docket No. 1 at 13-14, ¶¶ 67, 78.  The team initiated the takedown that led to plaintiff's injuries because Mr. Zetina "was alone and away from the Saturn."  *Id.* at 14, ¶ 78.  This does not demonstrate a decision made with time to deliberate.

Plaintiff's situation is not analogous to *Sanders v. Board of County Commissioners*, 192 F. Supp. 2d 1094 (D. Colo. 2001), as plaintiff contends.  Docket No. 46 at 19.  *Sanders* addressed law enforcement decisions during the Columbine shooting.  192 F. Supp. 2d at 1101-03.  The court in *Sanders* determined that the emergency situation calling for the intent-to-harm standard ended once the gunmen were found dead.  *Id.* at 1114-15.  At that point, law enforcement had time to deliberate and, thus, refusing to allow an injured civilian to receive medical assistance shocked the conscience.  *Id.*  Plaintiff, however, misunderstands the "emergency" requirement to the intent-to-harm standard.  There need not be an "explosive law enforcement situation" to require application of intent-to-harm.  *Radecki*, 146 F.3d at 1232.  Rather, the decision must be made "in haste . . . in a rapidly evolving, fluid, and dangerous situation[]."  *Perez*, 432 F.3d at 1167.  Plaintiff alleges that Mr. Zetina was a dangerous gang member high on illicit substances.  Such a situation is "evolving, fluid, and dangerous."  *Cf. id.*

Thus, the intent-to-harm standard applies.  *Perez*, 432 F.3d at 1167.  Plaintiff has pled no facts suggesting that any defendant intended to harm him.  *See* Docket No. 1.  Defendants' behavior is therefore not conscience shocking.

But even if the BATTLE team did have time to deliberate, thus making calculated or deliberate indifference the appropriate standard, plaintiff's claim would not succeed.  *Green v. Post* illustrates the point.  There, a police officer gave chase to a "suspected violator of the law, to verify that it was the vehicle involved in the theft of [$30.00 worth of] gas."  *Green v. Post*, 574 F.3d 1294, 1297 (10th Cir. 2009).  The officer admitted

that "he was not responding to an emergency situation." *Id.* Even though it was not an

"emergency situation," the officer drove at high speeds through an intersection, hitting

and killing a civilian. *Id.* The Tenth Circuit nevertheless held that the officer's "actions

do not meet the deliberate indifference standard. While it was surely negligent for [the

officer] to speed through a yellow light in response to an official call which, while not an

emergency, nonetheless required a rapid response, we cannot say it was more than

that." *Id.* at 1303-04. It did not "demonstrate a degree of outrageousness and a

magnitude of potential or actual harm that is truly conscience shocking." *Id.* (citation

omitted).

Here, too, the Court cannot conclude that defendants' decision to engage Mr.

Zetina while plaintiff was in the operational perimeter is more than negligent. At the

time that the BATTLE team set up the operational perimeter, no defendant was aware

that Mr. Zetina was armed. Docket No. 1 at 13-18, ¶¶ 69-110. The team made the

decision to initiate arrest because Mr. Zetina was alone and away from the Saturn. *Id.*

at 14, ¶¶ 74, 78. When Mr. Zetina came out of the apartment, he appeared to be

armed and also aware that several BATTLE team members were law enforcement. *Id.*

at 15, ¶¶ 87, 89. The "bear hug" was a response to Deputy White believing that Mr.

Zetina was armed and aware of the officers' presence. *Id.* at 15, 17, ¶¶ 88, 102. The

Court finds that the decision to initiate the takedown because Mr. Zetina was alone and

aware from the vehicle does not "demonstrate a degree of outrageousness and a

magnitude of potential or actual harm that is truly conscience shocking." *Green*, 574

F.3d at 1303-04 (citation omitted). Nor does the decision to place Mr. Zetina in a bear

hug – once it was determined he was armed and aware of the BATTLE team's presence – demonstrate the requisite degree of outrageousness to constitute conscience-shocking behavior. *See id.* In so concluding, the Court keeps in mind that it should be restrained and give deference to local decisionmakers. *Radecki*, 146 F.3d at 1230.[5]

### 3. Qualified Immunity

Even if plaintiff adequately pled conscience-shocking behavior by the team member defendants, qualified immunity would still shield these defendants from liability. Qualified immunity "protects public employees from both liability and 'from the burdens of litigation' arising from their exercise of discretion." *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019) (quoting *Allstate Sweeping, LLC v. Black*, 705 F.3d 1261, 1266 (10th Cir. 2013)). For a claim to survive a qualified immunity defense, a plaintiff must "demonstrate '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Id.* (quoting *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015)).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Plaintiff can demonstrate that a right is clearly established "by identifying an on-point Supreme Court or published Tenth Circuit decision" establishing the unlawfulness of the defendant's actions. *Cummings*, 913 F.3d at 1239 (quoting *Quinn*,

---

[5] Additionally, any argument that the BATTLE team should have called off the takedown and did not fails for alleging inaction

780 F.3d at 1005).  "Although it is not necessary for the facts in the cited authority to correspond exactly to the situation the plaintiff complains of, the 'plaintiff must demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited.'" *Estate of B.I.C. v. Gillen*, 761 F.3d 1099, 1106 (10th Cir. 2014) (quoting *Trotter v. Regents*, 219 F.3d 1179, 1184 (10th Cir. 2000)).

As the Court already discussed, there has not been a constitutional violation, and, therefore, defendants have qualified immunity.  But even if there were a constitutional violation, qualified immunity would still attach.  It is undisputed that the state-created danger doctrine is clearly established in the Tenth Circuit.  *See, e.g.*, *Estate of Reat v. Rodriguez*, 824 F.3d 960, 965 (10th Cir. 2016) ("[T]he elements of the state-created danger test are clearly established.") .  But plaintiff has offered no case, Tenth Circuit or otherwise, suggesting that it is clearly established that law enforcement "must not create danger to civilians" when "conduct[ing] operations to apprehend non-threatening felons in non-emergency situations."  Docket No. 46 at 9 n.3.  Plaintiff himself states that "Mr. Villanueva's factual scenario is one of first impression."  *Id.* at 7.

Plaintiff makes two arguments that qualified immunity does not apply.  First, that the appropriate benchmark is deliberate indifference cases, and so defendants' emergency cases do not demonstrate that the law was not clearly established.  *Id.* at 21-22.  Second, that the most factually analogous case is *Sanders*, the Columbine shooting case, and *Sanders* demonstrates that the law was clearly established.  *Id.* at 22.

As to plaintiff's first argument, the Court already concluded that plaintiff's view of an emergency situation under the state-created danger doctrine is too narrow.  Intent-to-harm, not deliberate indifference, is the appropriate standard.  As to the second, *Sanders*, as already discussed, is factually inapposite.  In *Sanders*, the defendant prevented an injured civilian from getting medical treatment.  192 F. Supp. 2d at 1102.  Plaintiff has alleged no well-pled facts that defendants prevented plaintiff from leaving the operational perimeter.  Indeed, in all of the cases where the Tenth Circuit has "found it appropriate to apply the doctrine of state-created danger, the victims were unable to care for themselves or had had limitations imposed on their freedom by state actors." *Reat*, 824 F.3d at 967.  Plaintiff has not pled that the BATTLE team "limited in some way [his] liberty . . . to act on his own behalf," *id.*, other than conclusory statements that defendants "kept" him within the operational perimeter.  Docket No. 1 *passim*.

Plaintiff's situation is "simply too factually distinct to speak clearly to the specific circumstances here." *Reat*, 824 F.3d at 967 (quoting *Mullenix*, 136 S. Ct. at 312).  No reasonable law enforcement officer could have known that his actions would have "resulted in liability under the Fourteenth Amendment." *Id.*

### B. Failure to Train

Plaintiff next asserts that the municipal defendants are liable under § 1983 for failure to train the BATTLE team in proper apprehension techniques.  Docket No 1. at 26.  "Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be

unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (footnote omitted). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

To state a claim for municipal liability under § 1983, a party must allege sufficient facts to demonstrate that it is plausible (1) that a municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation. *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004). A municipal policy or custom can take the form of

> (1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

Plaintiff focuses on the last type of policy, a failure to adequately train. "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "The deliberate indifference standard may be satisfied when the municipality has actual or

20

constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). "[C]ontinued adherence to an approach that [the decision makers] know or should know has failed to prevent tortious conduct by employees may establish . . . conscious disregard." *Bd. of Cty. Commrs. v. Brown*, 520 U.S. 397, 407 (1997); *see also Rowe v. City of Marlow*, 116 F.3d 1489, 1997 WL 353001, at *6 (10th Cir. June 26, 1997) (unpublished table decision) ("Municipal liability for failure to train or supervise requires a finding that the municipality's deliberate indifference 'led an employee to violate a plaintiff's rights' or 'failed to prevent tortious conduct by employees.'" (quoting *Brown*, 520 U.S. at 407)).

The Court already concluded that there was no constitutional violation. As a result, plaintiff cannot meet the first prong of the test for municipal liability, that there be a constitutional violation. *Jiron*, 392 F.3d at 419.

But, again assuming that the various BATTLE team defendants did commit a constitutional violation, plaintiff still has not adequately pled that any policy was the moving force behind his injuries or that the municipal defendants were deliberately indifferent. Plaintiff's "complaint makes no reference to . . . training protocols, inadequate or otherwise," *Zartner v. City and Cty. of Denver*, 242 F. Supp. 3d 1168, 1173 (D. Colo. 2014), nor does it "set[] out the text of any [] policy." *Sandberg v. Englewood*, 727 F. App'x 950, 964 (10th Cir. 2018) (unpublished); see *also* Docket No. 1. Plaintiff alleges that BATTLE is "not trained . . . to secure the scene of a police operation," Docket No. 1 at 9, ¶ 39, and that the various municipalities "did not provide

training on securing the area of an anticipated takedown, recognizing gang signs, or safe practices in apprehending a suspect."[6]  *Id.* at 27, ¶ 175.  But a "bare allegation of failure to train officers is not nearly enough to show deliberate indifference."  *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1298 (10th Cir. 2016).  Plaintiff has not shown that the municipal defendants were "on notice of the need for more or better training" and has not pointed to a "single incident" similar to this one.  *Id.*; *see also Sandberg*, 727 F. App'x at 964 ("Nor does the complaint describe any prior incidents that would have established a pattern or practice on the part of the city that could cause us to view subsequent inaction as evidence of a policy of deliberate indifference.").

Additionally, plaintiff's response to defendants' motion to dismiss confuses the alleged deliberate indifference of individual BATTLE team members with the deliberate indifference of the municipal defendants.  Plaintiff rehashes his arguments as to state-created danger and argues that BATTLE team members were deliberately indifferent because they had time to "deliberate [plaintiff's] safety" and "kept him within their operational perimeter."  Docket No. 46 at 29.  But the supposed deliberate indifference of the team does not continue to the policymakers who allegedly should have trained BATTLE to proceed differently.  Plaintiff alleges no facts suggesting a particular policy of the municipal defendants, that such policy was inadequate, or that the municipal defendants were indifferent to its inadequacy.

---

[6] The Court notes that plaintiff contradicts himself on this point.  Plaintiff states throughout the complaint that defendants were aware that Mr. Zetina was a dangerous gang member, *see* Docket No. 1, but then, in his allegations as to a failure to train, states that BATTLE team members are not trained to recognize gang symbols.

## IV.  CONCLUSION

For these reasons, it is

**ORDERED**  Defendants' Joint Motion to Dismiss [Docket No. 40] is **GRANTED**.

It is further

**ORDERED** that the Motion for Dismissal or Alternatively for Partial Dismissal by

Estate of Micah Flick [Docket No. 55] is **DENIED** as moot.  It is further

**ORDERED** that judgment shall enter for defendants and against plaintiff on all

claims.  It is further

**ORDERED** that, within 14 days of the entry of judgment, defendants may have

their costs by filing a bill of costs with the Clerk of the Court.  It is further

**ORDERED** that this case is closed.


DATED May 28, 2020.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge